**MUZE, INC., Plaintiff,**

v.

**DIGITAL ON–DEMAND, INC., Defendant.**

No. 00Civ.8195 (LTS)(FM).

United States District Court, S.D. New York.

Nov. 20, 2000.

Darby & Darby P.C., by Andrew Baum, Ross J. Charap, Patricia J. Clarke, New York City, for Plaintiff Muze, Inc.

Donovan & Yee LLP, by Marya Lenn Yee, Francine Miller, New York City, for Defendant Digital On–Demand, Inc.

## OPINION

SWAIN, District Judge.

This matter concerns rights to use bibliographic information relating to vast amounts of the canon of recorded music and digitally-recorded samples of such music. Plaintiff Muze, Inc. ("Muze"), a New York corporation with its principal place of business in New York, owns the material in question. Defendant Digital On–Demand, Inc. ("DOD") is a licensee of the bibliographic and music databases. The case comes before the Court on Muze's motion for a preliminary injunction precluding DOD from continuing to utilize the licensed databases for any purpose; the motion is predicated on Muze's allegation that DOD has breached the licensing agreement.

The Court has jurisdiction of this case pursuant to 28 U.S.C. section 1332(a), the parties allegedly being citizens of different states[1] and the amount in controversy in the litigation exceeding $75,000. Venue is proper pursuant to 28 U.S.C. section 1391(a)(2).

This motion came on pursuant to an order to show cause, signed on October 27, 2000. DOD's opposition papers were served and filed on November 3, 2000; Muze's reply papers were served and filed, and oral argument on the motion heard in open court, on November 6, 2000. In accordance with a schedule set at the hearing, DOD and Muze filed and served supplemental affidavits on November 8, 2000, and November 9, 2000. The Court requested further evidentiary submissions by order dated November 8, 2000. The parties filed additional affidavits on November 9, 2000, in response to that order. The parties have stipulated to the Court's resolution of all relevant factual issues based on their affidavits and documentary submissions; neither party has objected to the Court's consideration of any of the evidence so proffered. The Court has considered thoroughly the parties' submissions, arguments and proffers, including the "Declaration [of Gary Geller] in Support of Order to Show Cause for Preliminary Injunction," "Plaintiff's Memorandum in Support of its Order to Show Cause for a Preliminary Injunction," "Declaration of Scott Smith," "Declaration of Robert McCray," "Declaration of Charles Gorman," "Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction," "Reply Declaration [of Paul Zullo] in Support of Motion for Preliminary Injunction," "Supplemental Declaration of Charles Gorman," "Supplemental Declaration of Robert McCray," "Supplemental Declaration [of Gary Geller] in Support of Motion for Preliminary Injunction" and all accompanying exhibits. This Opinion constitutes the Court's findings of fact and conclusions of law for purposes of Rule 52 of the Federal Rules of Civil Procedure. For the reasons set forth below, Muze's motion is granted to the extent it seeks to preclude DOD's uti-

---

1. The complaint alleges that DOD is a California corporation. DOD's answer is not yet due. DOD has not contradicted Muze's assertion in the course of litigating the instant motion, and the documentary evidence submitted to the Court indicates that DOD's operations are California-based.

lization of the bibliographic and music databases in question.

## FINDINGS OF FACT [2]

*Background*

The material facts are undisputed.

Muze owns a proprietary database containing bibliographic information (the "Bibliographic Database") on more than 1.5 million pieces of recorded music. The Bibliographic Database, which is searchable by song, album, title, artist and keyword, among other categories, is updated weekly by a staff of more than 200 people. (Declaration of Gary Geller, dated October 26, 2000 ("Geller Declaration 1") at ¶ 2). Muze also owns a database of digitized 30–second audio samples (the "Clips" and, together with the "Bibliographic Database," the "Database") from more than 1.5 million pieces of music. The Clips are linked to entries in the Bibliographic Database, permitting a listener or other user to retrieve information about the recording. (*Id.* at ¶ 3). One of Muze's principal lines of business is the marketing and maintenance of "listening systems" in retail music stores. Muze's listening system, the "MSD," permits retail store customers to listen, through headphones placed strategically throughout the recorded music sections of the stores, to clips from compact discs ("CDs") that they may wish to buy. Muze also offers retailers "kiosks" for placement in the music departments. The kiosks, featuring video screens and keyboards, permit store customers to research the Bibliographic Database. (Geller Declaration 1 at ¶¶ 4–5). The MSD systems are sold to the retail stores for over $50,000; Muze maintains them and updates the available music, and receives additional revenues, pursuant to licensing and maintenance agreements. The kiosks are sold to the stores for approximately $4,300. (Reply Declaration of Paul Zullo, dated

November 6, 2000 ("Zullo Declaration") at ¶ 6 and Exhibit B). Muze currently has MSD systems and/or kiosks installed in the music departments of approximately 250 Barnes & Noble retail stores. For a number of years, Barnes & Noble has ordered MSD systems for its stores as they open, notifying Muze of the plan to open each store with a music department and placing formal purchase orders for installation of the relevant equipment. (Geller Declaration 1 at ¶ 6).

Muze and DOD entered into a licensing agreement in 1999. The first two portions of the agreement, consisting of a document captioned "Muze Database License" (the "DB License") and an "Appendix 1" thereto (the "Appendix"), became effective July 26, 1999. The agreement's stated term was through July 25, 2000; it covered use of the Bibliographic Database as well as Muze's proprietary software enabling display of the Bibliographic Database on the video screens of computer terminals. The parties entered into a "Clips Addendum" to the agreement (the "Addendum" and, together with the DB License and the Addendum, the "Licensing Agreement") on October 6, 2000. (Exhibits A and B to Declaration of Scott Smith, dated November 2, 2000 ("Smith Declaration")). For purposes of this motion, the parties have stipulated that the Licensing Agreement, including the Addendum, was extended in October 1999 for a two-year period ending October 27, 2001.

At the time the parties originally entered into the Licensing Agreement, the focus of DOD's business operations was its "Digital Distribution Network" (the "DDN"), a system designed to utilize high-speed data transmission through DOD's "RedDotNet" to deliver recorded music and other digitized entertainment content to retail terminals located in music stores. Store customers could use the terminals to

---

**2.** To the extent any of the findings of fact set forth herein includes one or more conclusions of law, it shall be deemed a conclusion of law, and to the extent the section labeled "Conclu-

sions of Law," *infra,* contains one or more findings of fact, such conclusions shall be deemed a finding of fact to that extent.

select music for "burning" into custom CDs and/or "special order" CDs not available in the store's physical inventory. (Smith Declaration at ¶ 3; Geller Declaration 1 at ¶ 9; Declaration of Robert McCray, dated November 2, 2000 ("McCray Declaration 1") at ¶¶ 3–4). The DDN thus provided the retailers with a "virtual inventory" potentially much broader than their physical inventories. The DDN also included equipment that would "burn" CDs and print liner notes and graphics onsite, (Exhibit D to Smith Declaration at 2), enabling the retailer to sell on demand from the virtual inventory.

The July 26, 1999 DB License and Appendix gave DOD the right to utilize the Bibliographic Database in its DDN, thus enabling DOD to offer store customers using DDN terminals the ability to research and view information concerning their desired music on the DDN terminals. The DDN terminals were also set up to permit customers to buy custom-"burned" CDs or place special orders for prerecorded music not in the store's physical inventory, again utilizing the Bibliographic Database and Muze's software interface to specify the desired music. The October 1999 Addendum permitted DOD to add an audio feature to the DDN terminals—a customer standing at the terminal could now use headphones to listen to a 30–second "clip" of the desired music, rather than make a purchase decision based on visual information only.

In October 1999, DOD entered into a letter of intent with of Alliance Entertainment Corp. ("AEC"), one of the leading providers of data and prerecorded music and video products to the entertainment industry. DOD subsequently became a wholly-owned subsidiary of AEC. (McCray Declaration 1 at ¶¶ 2, 10; Smith Declaration at ¶ 2).

In or about September 2000, DOD unveiled a new incarnation of the DDN. This new version of the DDN separates the music-ordering function from the listening function. Thus, DDN now offers a "listen-

ing-only" system similar to Muze's MSD. The listening-only DDN system, like the MSD, involves strategic placement of headphones throughout the retail music area. Customers can listen to samples of the available music as they peruse the physical inventory. Like the MSD, it serves as a promotional tool for the retailer's physical inventory (indeed, DOD's counsel acknowledged at oral argument that DOD's new system promotes the prerecorded entertainment products supplied to retailers by DOD's new parent company, AEC, and that this cross-marketing enables DOD to provide the systems to retail stores free of charge). It features a major technological improvement over the MSD, namely an interface that permits the customer to cue up Clips for listening merely by scanning the bar code of a CD. Most of the listening stations utilized in the new DDN system do not feature video screens, utilizing instead a two-digit LED display that shows the number of the track being played; the customer can change tracks by turning a knob. DOD also provides two other types of listening stations for use with the new system. Both have video display screens that contain text and written images. Customers use knobs and/or a touch screen to view information and hear music after scanning the bar code of the CD they wish to explore. (Supplemental Declaration of Robert McCray, dated November 8, 2000 ("McCray Declaration 2") at ¶¶ 4–6). The written information displayed on these units' video screens includes the title of the album, the name(s) of the performer(s), the name of each song or track, the year the album was released, and the price of the recording. The units do not have an ordering function. (*Id.* at ¶¶ 6–8).

DOD currently has no source, apart from Muze, of bibliographic data and sound clips for its listening system, although AEC is in the process of developing a similar database. (Geller Declaration 1 at ¶ 13). DOD's introduction of its new system has thus far been quite suc-

cessful. Indeed, the Barnes & Noble retail chain, which has been a significant user of Muze's MSD system for at least the past five years, (Geller Declaration 1 at ¶ 6), removed the MSD from its "flagship" store at Union Square in Manhattan and replaced that listening system with the listen-only version of DDN in September 2000. Barnes & Noble has also made plans to install the new DOD system in additional Barnes & Noble stores this year, (Declaration of Charles Gorman, dated November 2, 2000 ("Gorman Declaration") at ¶ 7), cancelling almost $300,000 worth of purchase orders for MSD equipment and Muze information kiosks, (Geller Declaration 1 at ¶ 17; Exhibit B to Zullo Declaration).

Of the approximately 58 pieces of DDN equipment installed in the music department of the Union Square store, approximately 52 are "listen-only" posts scattered throughout the department that permit customers to listen to music by scanning the bar code of a CD and manually turning a dial to select a particular Clip from the CD. (Declaration of Gary Geller, dated November 9, 2000 ("Geller Declaration 2") at ¶¶ 2–3, 6; McCray Declaration 2 at ¶ 9). The only visual displays on these units consist of a printed banner reading "Listen to any CD," a two-digit LED readout of the track number, and a fine-print sticker displaying Muze's copyright information. (Exhibits A, B, D to Geller Declaration 2). The remaining units have video displays as well as Clip-playing capability. (Geller Declaration 2 at ¶ 5). According to the supplemental affidavit submitted by DOD, none of the models in place at the Union Square store has ordering capability, and none contains "hyperlink technology whereby a retail customer can link to the World Wide Web or the Internet." (McCray Declaration 2 at ¶¶ 2–3).

On September 15, 2000, Muze's counsel wrote to the general counsel of AEC, DOD's parent corporation, describing the new DDN system installed at Barnes & Noble, asserting that the use of the Muze Database and Clips in connection therewith was not "contemplated or authorized by the [Database License] Agreement and Addendum," that "the Muze copyright and trademark notices are not displayed by the DOD listening system in breach of the Agreement . . . [and that] the listening system display screen promotes the *AMG* database." [3] (Exhibit C to Geller Declaration 1 at 1) (emphasis in original). Muze's counsel demanded immediate cessation of the use of the Database and Clips. By letter dated September 19, 2000, AEC asserted, among other things, that use of the Database and Clips comported with the "DDN use" and "display use" provisions of paragraph 2.a. of the DB License, (see *infra* ), and indicated that DOD had undertaken to correct its "oversight" concerning compliance with the provision of the Licensing Agreement requiring the display of certain information regarding Muze and Muze's copyrights on DDN terminals accessing the Database. (Exhibit D to Geller Declaration 1 at ¶¶ 1, 5). Charap again wrote to Lewis on September 21, 2000, asserting breaches of paragraphs "2a, 3c and 3e" of the DB License, and giving notice of Muze's intent to terminate the Licensing Agreement if the alleged breaches were not timely cured, and also notifying DOD of Muze's intent to terminate the Licensing Agreement in any event pursuant to a provision permitting termination on 90 days' notice in the event DOD is acquired by a competitor of Muze.[4] DOD continued to operate the new DDN system. Muze delivered a further termination notice, dated October 24, 2000, and purporting to terminate the agreement effective as of that same date, pursuant to paragraph 2.b. of the DB License. The

**3.** The "AMG" database referred to in the letter is the "All Music Guide," a Muze competitor owned by AEC. (Geller Declaration 1 at ¶ 11).

**4.** The parties agree that AEC is a competitor of Muze and that Muze's notice invoking the 90–day termination clause will terminate the agreement effective December 14, 2000.

letter further demanded the return of all copies of the Database and Clips in accordance with paragraph 2.c. of the DB License. (Exhibit F to Geller Declaration 1). DOD has nonetheless continued to use the Database and Clips in its new DDN system.

Muze commenced this litigation on October 25, 2000, with the filing of its complaint and the submission of a proposed order to show cause seeking preliminary injunctive relief requiring DOD's cessation of its use of the Database and Clips, and the return of all copies of the material.

*The Agreements*

The Licensing Agreement provisions that are pertinent to the issues raised in this motion are as follows:

*July 26, 1999 Muze Database License*

As noted above, the DB License, with its Appendix, was entered into first, and at the time covered only the use of the bibliographic portion of the Database. The "Grant of License" provision of this agreement reads as follows:

> Muze grants Licensee a limited, nonexclusive, non-transferable right to use the Database during the Term [of the agreement] (i) in conjunction with the Licensee's DDN and the sale of Products, (ii) for internal use, (iii) for display on Terminals, and (iv) on a single database server (or multiple servers linked by a common network file system) owned or leased by Licensee.

(DB License at ¶ 2.a.). "Licensee" is defined as DOD; the "DDN" is defined as "Licensee's Digital Distribution Network, consisting of Content storage and serving facilities, data transmission services, and Terminals." "Content" is defined as "digital audio content;" and "Products" are defined as "Content recorded on-demand on physical media, downloads of Content, or pre-manufactured physical media containing Content." The term "Terminals" is defined as "the kiosk or other digital distribution terminals connected to the DDN." (DB License at ¶ 1). The section of the agreement's Appendix that deals with "Rights Notices" fleshes out the meaning of "Terminals" as used in the agreement. That section provides that "Licensee shall ensure that the following Muze proprietary rights notices appear on each view on the Terminal that contains data from the Database(s): For Music: 'Copyright 1948–(current year) Muze Inc. For personal non-commercial use only. All rights reserved.'" The section further requires that "[o]n the main interface screen of each Terminal: The 'Powered by Muze®' button [must appear], with a hyperlink to Muze's website if the Terminal is connected to the internet and has browsing capability, or to a static version of a branded Muze information page (with the form to be agreed upon by the parties in good faith) if the Terminal is not connected to the internet and/or does not have browsing capability." (Appendix at 1–2).

The DB License permits Muze to terminate the agreement following thirty days' notice of and opportunity to cure "any material breach by Licensee of its obligations hereunder." (DB License at ¶ 2.b.). The "Licensee's Obligations" section of the agreement provides, *inter alia*, that *"Licensee shall:* ... "[d]isplay Muze's proprietary rights notices, links, and logos, in the manner set forth in Appendix 1, on the Terminals." (DB License at ¶ 3.c.) (emphasis in original). That section further provides that *"Licensee shall not:* ... "[u]se or permit use of the Database other than in the manner contemplated by this Agreement or as authorized by Muze .... [or][e]xcept as necessary to use the Database as contemplated by this Agreement or as authorized by Muze, publish, disseminate, transfer, sell, assign, timeshare, rent, or sublicense the Database, any material subset thereof, or any copies thereof." (DB License at ¶¶ 3.e., h.). (emphasis in original).

The DB License also addresses the terms under which injunctive relief may be

awarded in the event of breach of the license provisions:

> Licensee acknowledges that certain breaches by it of its negative covenants under these License Terms may cause Muze irreparable harm for which there may be no adequate remedy at law. Licensee agrees that under such circumstances, Muze shall be entitled to equitable relief by injunction or otherwise, without the obligation of posting any bond or surety.

(DB License at ¶ 6.b.).

The DB License includes an integration clause and calls for interpretation of its provisions in accordance with New York law:

> This Agreement shall be governed by New York law as though executed and fully performed in New York.... This Agreement is the parties' entire agreement with respect to the Database and supersedes any prior oral or written representations with respect thereto.

(DB License at ¶¶ 6.b., e.).

### The Clips Addendum

Muze and DOD later entered into the Addendum. That agreement, dated October 6, 1999, permitted DOD to use up to 1.2 million digitized audio excerpts, or "Clips," from music listed in the Muze music Database. The introductory provision of the Addendum, which is in the form of a letter agreement, expressly provides that it adds to the DB License and that "[a]ll other terms of the [DB License] Agreement, including its duration, continue in force and apply to the subject matter of this Addendum. Any capitalized terms not defined in this Addendum shall have the meanings ascribed to them in the Agreement."

The Addendum provision relating to DOD's utilization of the Clips describes certain attributes of Terminals and limits the use of Clips to Terminals:

> To listen to the Clips, Terminals will need appropriate hardware capabilities and appropriate "player" software, provision of which shall be the responsibility of Licensee or its contractors or clients. *The Clips shall be served directly to Terminals by Licensee via the DDN. The only permitted use of Clips is for promotional purposes in conjunction with Terminals* located in retail establishments that sell music products.

(Addendum at ¶ 1) (emphasis supplied).

The license fee provisions of the Database License and the Clips Addendum indicate the parties' expectation that the Database and the Clips would be used primarily, if not exclusively, in connection with DOD's sale of digitized music—whether "burned on-demand" or special-ordered—through Terminals. Appendix 1 to the Database License sets the "License Fee" as a "percentage of the actual wholesale price paid to Licensee for each sale of a Product listed in the Database." (Appendix at 1). The Addendum sets a per-unit fee "per special order item sold" and "for items sold that are burned on demand if, in fact, a Clip is used to promote the sale of the product [sic]." (Addendum at ¶ 5).

### The Parties' Contentions

Muze argues that DOD's use of its Database in connection with the listen-only version of the DDN constitutes a breach of the Licensing Agreement. Muze seeks a preliminary injunction barring DDN's further use of the Database and requiring the return to Muze of all copies of the Database currently in DOD's use or possession. DOD asserts that the Licensing Agreement permits it to utilize the Database, including the Clips, in its new DDN system, arguing that such use is in "conjunction with [DOD's] DDN and the sale of Products" and constitutes "display on Terminals," all within the meaning of section 2.a. of the DB License.

The parties have stipulated that the Licensing Agreement will terminate in any event as of December 14, 2000, based on Muze's notice of cancellation pursuant to

the competitor acquisition provision of section 6 of the DB License, and that DOD therefore will have no right under the Licensing Agreement to use the Database after that date. However, if Muze's contention that use of the Database in the new DDN system constitutes a material breach of the Licensing Agreement is correct, the Licensing Agreement has been cancelled effective October 24, 2000. Thus, as a practical matter, the issue before the Court is whether DOD should be permitted to continue to use the Database, in connection with the listen-only version of the DDN, through December 14, 2000. Muze contends that such continued use constitutes a violation of the agreement and that Muze is suffering irreparable harm because, *inter alia*, its own competitive position is being degraded materially by DOD's use of the Database and Clips to demonstrate, promote and operate DOD's new system.

### CONCLUSIONS OF LAW[5]

■■■ In this Circuit, a grant of preliminary injunctive relief is generally appropriate only upon the movant's showing

(a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*Tom Doherty Assoc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995) and cases cited therein. *See also Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.,* 175 F.3d 266, 270 (2d Cir.1999). Where, however, the relief sought by the movant will alter the status quo or will provide "substantially all the relief sought and that relief cannot be undone even if

the defendant prevails at a trial on the merits," a higher standard applies. *Tom Doherty,* 60 F.3d at 34. Under this standard, an injunction should issue "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* (citation omitted). "The 'clear' or 'substantial' showing requirement ... alters the traditional formula by requiring that the movant demonstrate a greater likelihood of success." *Id.* A movant in such circumstances must also demonstrate that irreparable harm will be suffered in the absence of such an injunction. *See id.* at 37–39.

Here, movant seeks to alter the status quo by halting DOD's use of the Database and Clips immediately, rather than on the delayed termination date acknowledged by DOD. The preliminary injunctive relief sought is thus substantially all of the injunctive relief sought in the complaint.[6] Barring further use of the Database and Clips would render useless the new DDN system installed at Barnes & Noble, because DOD currently has no alternative source of music database information or audio clips. Although it might be possible to "undo" such relief in the future by, for example, restoring DOD's right to utilize the Database for a comparable period of time, the parties' representations as to the status of competitive development of listening systems and the commercial importance of the upcoming holiday season lead this Court to conclude that application of the higher standard of proof is appropriate. The Court finds that Muze has met both elements of that higher standard. Of course, Muze, having met the higher standard of proof, has also satisfied the ordinary preliminary injunction requirements.

---

**5.** See *supra* n. 2.

**6.** Both the complaint and the motion for a preliminary injunction also seek the return of all copies of the Database and Clips, as pro-

vided for in paragraph 2.c. of the agreement. At oral argument, Muze's counsel asserted that the cessation of use of the material is Muze's primary object on this motion.

*Entitlement to Relief Requested—Likelihood of Success on the Merits*

The Second Circuit's heightened preliminary injunction standard requires "a clear or substantial showing of a likelihood of success" on the merits of the litigation. *Tom Doherty*, 60 F.3d at 35.

The issue thus before the Court in connection with the first prong of its determination as to whether preliminary injunctive relief is appropriate is whether Muze has demonstrated a strong likelihood of success on its cause of action alleging breach of the Licensing Agreement.[7] The central question in this regard, as presented by the parties, is whether the rights granted to DOD under the Licensing Agreement include the right to divorce its use of the Database from the direct-sales features of the DDN, that is, the right to provide retail customers of DOD's clients with access to Muze's audio clips through a listen-only system with interactive video features and no ordering function. Muze contends that the agreements only permit use of the Clips in connection with DOD's sale of its own music products through the DDN and argues that the pricing structure of the agreements reflects the parties' intention so to limit use of the Clips. DOD contends that its current use of the Database and Clips is permitted by paragraph 2.a. of the DB License portion of the Licensing Agreement. That paragraph reads in its entirety as follows:

> Muze grants to Licensee a limited, non-exclusive, non-transferable right to use the Database during the Term (i) in conjunction with the Licensee's DDN and the sale of Products, (ii) for internal use, (iii) for display on Terminals, and (iv) on a single database server (or mul-

tiple servers linked by a common network file system) owned or leased by Licensee.

(DB License at ¶ 2.a.).

DOD argues that the listen-only system that has been installed at Barnes & Noble comports with paragraph 2.a.(i) because it is linked to the DDN and relates to the sale of Products, albeit such sales by Barnes & Noble rather than "burned-on-demand" or special order sales through the DDN. DOD seeks to buttress its interpretation of paragraph 2.a.(i) by reference to the "Other Use Limitations" section of the Appendix, which reads: "Licensee's use of the Database (defined as the Bibliographic Database and related graphical user interface and research software) is limited to use on the server(s) and Terminals of the DDN, and only in conjunction with the sale of Products by Licensee's DDN participants." (Appendix at 1). According to DOD, use to promote sales by DDN's customer, Barnes & Noble, is within the scope of these provisions.

▇▇▇ Not surprisingly, Muze takes a different view and argues that these provisions, when read in the context of the license fee provisions of the Licensing Agreement[8] and the nature of the parties' respective businesses at the time the Licensing Agreement was negotiated, limit the permitted use to promotion of DOD's sales through the DDN. Thus, argues Muze, DOD has breached the Licensing Agreement by divorcing its use of the Clips and Database from its musicsales business and—adding insult to injury—the Licensing Agreement does not even provide a mechanism for Muze to be paid for such use. Both parties have proffered af-

---

**7.** Although Muze's complaint, and its moving papers, also assert causes of action based on alleged interference with Muze's contracts and prospective business relationships with Barnes & Noble, at oral argument Muze's counsel limited the predicate for the instant motion to the alleged breach of the Licensing Agreement described above.

**8.** The Licensing Agreement provides for payments to Muze for Bibliographic Database and software use based on specified percentages of DOD's receipts "for each sale of a Product listed in the Database," (Appendix at 1), and, with respect to Clips, for payment of fees on a per-unit basis for items special ordered or burned-on-demand, (Addendum at ¶ 5).

fidavits as to their respective understandings and expectations in this regard at the time the Licensing Agreements were negotiated.[9]

In light of the evidence as to the nature of the physical components of the DDN's new system, the Court finds it unnecessary at this stage of the litigation to resolve any ambiguity that may exist with respect to the general permissibility of Database use apart from the DDN's sales functions. Unambiguous provisions of the Appendix and Addendum clearly limit the hardware on which DOD is permitted to utilize the Database for non-internal applications to "server[s] . . . owned or leased by [DOD]," (DB License at ¶ 2.a.(iv)), and Terminals.[10] There is no dispute that the server delivering Database content to the listen-only system at Barnes & Noble is owned by DOD; none of the evidence thus far submitted suggests a breach of the "server" limitation of the Licensing Agreement.

■ The evidence does, however, demonstrate a strong likelihood of breach of the provisions limiting "display" or other customer interface use of the Database to "Terminals." As noted above, specific provisions of the Licensing Agreement describing attributes of Terminals supplement and refine the general definition of "Terminals" set forth in the first section of the DB License.

The Appendix requires the display of certain written information on "each view on the Terminal that contains data from the Database(s)" and further requires the provision of a "hyperlink" on "the main interface screen of each Terminal." (Appendix at 1–2). The Addendum notes that, "[t]o listen to the Clips, Terminals will need appropriate hardware capabilities and appropriate 'player' software." (Addendum at ¶ 1).

These provisions make clear that the "Terminals" contemplated by the Licensing Agreement are not mere listening posts but are, rather, digital distribution hardware whose listening function is ancillary to other functions, that are capable of displaying more than one view of visual information in response to customer input, and that are capable of displaying visual information about Muze in conjunction with retail customer access to the Clips and other Database material. Approximately 52 of the 58 machines through

---

9. In interpreting a contract, a court should look first within the "four corners" of the document. *Tom Doherty*, 60 F.3d at 35–36. A contract should be interpreted to give effect to the "plain and ordinary" meaning of its language. *See, e.g., Coleman Co. v. Hlebanja*, No. 96 Civ. 1288, 1997 WL 13189, 1997 U.S. Dist. LEXIS 225, at *12 (S.D.N.Y. Jan. 15, 1997). Where the parties have reduced an agreement to an integrated writing, as they have in this case, "the parol evidence rule bars all evidence of prior or contemporaneous negotiations or agreements offered to modify or contradict the provisions of the writing." *Point Developers, Inc. v. Federal Deposit Insurance Corp.*, 921 F.Supp. 1014, 1019 (E.D.N.Y.1996). Under New York law extrinsic evidence is admissible notwithstanding an integration clause only when used in aid of resolving ambiguities in the contract. *Tom Doherty*, 60 F.3d at 36; *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir.1990); *ESPN, Inc. v. Office of the Commissioner of Baseball*, 76 F.Supp.2d 383, 404 (S.D.N.Y.1999). Thus, if a contract is an unambiguous and integrated writing, a court may not consider extrinsic evidence to vary, contradict, add to, or explain its terms. *E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc.*, 90 F.Supp.2d 277, 303 (S.D.N.Y.2000). In light of these principles and having reviewed the plain language of the Licensing Agreement, the Court declines to consider the proffered extrinsic evidence of the parties' understandings and expectations for the purposes of interpreting the provisions of the Licensing Agreement that are material to resolution of the instant motion.

10. The "Other Use Limitations" section of the Appendix provides that "Licensee's use of the Database is limited to use on the server(s) and Terminals of the DDN . . . ." (Appendix at 1). "Database" is defined as "the Muze database(s) and any software specified in Appendix 1." (DB License at ¶ 1). The Addendum provides: "[t]he Clips shall be served directly to Terminals by Licensee via the DDN. The only permitted use of the Clips is for promotional purposes in conjunction with Terminals." (Addendum at ¶ 1).

which DOD currently provides retail customer access to Clips at Barnes & Noble's Union Square store do not have these capabilities. Under these circumstances, there is a strong likelihood that Muze will prevail on its claim that DOD has committed a breach of the Licensing Agreement by providing the Database and Clips for retail customer interface other than through Terminals.

Such use also establishes a strong likelihood of success on Muze's claims that DOD has breached the "negative covenant" provisions of the DB License in which DOD agreed that it would not, *inter alia,* "[u]se or permit use of the Database other than in the manner contemplated by this Agreement or as authorized by Muze" and that it would not "[e]xcept as necessary to use the Database as contemplated by this Agreement or as authorized by Muze, publish, disseminate, transfer, sell, assign, timeshare, rent, or sublicense the Database, any material subset thereof, or any copies thereof." (DB License at ¶ 3.e., h.).

■ The absence of any specific provision for the payment of Database licensing fees by DOD other than in conjunction with its own sales of Products through the DDN and the fact that DOD's listen-only terminals have supplanted Muze's MSD system in Barnes & Noble's Union Square store clearly suggest that DOD's breach is a material one. Muze has thus also established a strong likelihood that it will be found to have terminated effectively the Licensing Agreement as of October 24, 2000.

*Entitlement to Relief Requested -Irreparable Harm*

■ Having found a strong likelihood of success on the merits, the Court turns to the issue of irreparable harm. Irreparable harm in this context is "an injury that is not remote or speculative but actual and imminent, and 'for which a monetary award cannot be adequate compensation.'" *Tom Doherty,* 60 F.3d at 37

(quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979)). The party seeking injunctive relief must show that it is threatened with imminent loss that is very difficult to quantify. *Id.* at 38.

Muze argues that DOD's unauthorized use and misappropriation of its Database has enabled DOD to gain a competitive advantage over Muze by affording DOD with an opportunity that it would not otherwise have had to test, use and publicize a new listening system with greater capabilities than Muze's MSD system. In that DOD has not yet secured its own data and clips, DOD would not have been in the position to provide its technologically-advanced product at this time to Barnes & Noble and other retailers. Muze contends that DOD has thus unfairly obtained a foothold with Barnes & Noble for listening systems, which foothold places in jeopardy Muze's entire relationship with its largest customer. (Geller Declaration 1 at ¶¶ 19–20). Furthermore, Muze argues that the injury that it will suffer as a result of DOD's breach of the Licensing Agreement is aggravated by the fact that DOD, with its listening system installed in a "flagship" store, will receive increased industry attention during the upcoming holiday season. The resulting perception in the minds of industry and retail store executives that DOD is an innovator will, Muze asserts, create incalculable benefits to DOD and incalculable harm to Muze.

DOD concedes that it has been competing with Muze for business in the listening system industry but maintains that its use of Muze's Database and Clips was authorized under the Licensing Agreement. As explained above, the Court finds it unlikely that DOD will be able to establish the latter proposition. DOD argues that Muze has not demonstrated that it will suffer irreparable harm, as the harm allegedly suffered by Muze is not actual and imminent, and its damages, if any, are quantifiable. Asserting that Muze's potential loss of Barnes & Noble as a customer is merely

speculative, DOD points to statements of Barnes & Noble Vice President Charles Gorman that Barnes & Noble has not finalized any agreements for the installation of listening systems in 2001 and continues to have an ongoing relationship with Muze relating to the possible procurement of Muze's goods and services. (*See* Gorman Declaration at ¶¶ 6, 8). DOD further argues that any actual or potential loss of business is compensable with money damages, suggesting that the Court could fashion a remedy based on Muze's own revenue figures.

The Court finds, given the strong likelihood that Muze terminated effectively the Licensing Agreement as of October 24, 2000, that the continued unauthorized use of Muze's Database and Clips by DOD constitutes irreparable harm. DOD's alleged breach of contract consists of exploiting Muze's copyrighted Bibliographic Database and Clips through hardware not contemplated by the Licensing Agreement, and in a manner that is directly competitive with Muze's core MSD business. By using the Database in this apparently unauthorized manner, DOD has marketed itself to Barnes & Noble, and currently presents itself to the world, as an MSD competitor that is currently in a position rightfully to deliver audio content through hardware that is technologically superior to that offered by Muze. In that DOD is now an AEC subsidiary, and therefore in a position to function as a loss leader in a synergistic cross-marketing relationship with its parent, DOD has also been able to undercut MSD on price, offering Muze's content through DOD's competitive listening system at no charge to Barnes & Noble as a means of enhancing the market for the prerecorded products AEC sells to Barnes & Noble.

Muze, on the other hand, charges retailers for the MSD hardware, as well as for maintenance of the system. DOD's strategy has been quite successful. Barnes & Noble, which has been a very significant MSD customer for more than five years,

has removed the MSD system from its "flagship" Union Square store and cancelled almost $300,000 in purchase orders for additional Muze systems for new stores. Barnes & Noble has placed orders for the new DDN system and has not been reassuring in its communications with Muze regarding future installations of the MSD. (*See* Geller Declaration 1 at ¶ 17). DOD has, in effect, at the Union Square store, an up-and-running demonstration model of its new technology, available to the public and to other potential customers during the busy holiday season.

The evidence demonstrates that such misuse threatens imminent injury to the economic value of the goodwill and reputation associated with Muze's product. As discussed above, Muze took steps in the Licensing Agreement to ensure public and industry association with its Database and Clips by requiring that certain proprietary rights notices appear on "each view on the Terminal that contains data from the Database" and that, on "the main interface screen of each Terminal," there be a hyperlink to Muze's website if the Terminal was connected to the Internet and had browsing capability, or to a static version of a branded Muze information page if no such browsing capability were available. (Appendix at 1–2). Approximately 52 of the 58 listening posts operated by DOD are not capable of displaying the proprietary notices in the manner contemplated by the Appendix, rendering futile Muze's contractual efforts to foster consumer identification with its product. *Cf. Church of Scientology Int'l v. Elmira Mission of the Church of Scientology,* 794 F.2d 38, 44 (2d Cir.1986) (court found likelihood of confusion from licensee's continued unauthorized use of a trademark; licensor's loss of control of its trademark constituted irreparable harm); *Gilliam v. American Broadcasting Companies,* 538 F.2d 14, 19 (2d Cir.1976) (editing and broadcasting of plaintiffs' work in manner which exceeded license impaired integrity of work and resulted in irreparable harm).

The evidence further demonstrates that DOD's conduct presents an immediate risk of harm to Muze's reputation as a leader in its field. The potential loss of market advantage has been recognized to constitute irreparable harm. *See Warner Bros., Inc. v. Gay Toys, Inc.,* 658 F.2d 76, 79 (2d Cir.1981) (irreparable harm found where plaintiff and its licensees had a substantial financial interest at stake and plaintiff has a history of first use of the symbols at issue); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Rahn,* 73 F.Supp.2d 425, 428 (S.D.N.Y.1999) (threat to plaintiff's business created by defendants' misappropriation of confidential records constituted irreparable harm); *Anacomp, Inc. v. Shell Knob Services, Inc.,* No. 93 Civ. 4003, 1994 WL 9681, at *6 (S.D.N.Y. Jan. 10, 1994) (loss of market leadership resulting from defendants' unauthorized use of plaintiff's proprietary information to compete directly with plaintiff held irreparable); *Preferred Electric & Wire Corp. v. Katz,* 462 F.Supp. 1178, 1189 (E.D.N.Y.1978) (irreparable harm found where there was possible destruction of plaintiff's competitive advantage along with economic losses and possible liquidation of plaintiff's business).

In this case, the harm to Muze's market position and reputation is both actual and imminent. The harm wrought by the breach is broader than lost license fees and, indeed, broader than lost revenues. DOD's venture beyond the confines of its contractually-permitted use of the Database has enabled it to enter a listening system market for which it would otherwise have been unprepared (for lack of deliverable audio content). It is using Muze's property to build goodwill for itself, damaging Muze's goodwill and market position at the same time. The short- and long-term harm concomitant to this conduct is not readily identifiable, or precisely calculable in money damages. Nor would it appear to be reparable.

In the Second Circuit, courts have found threatened imminent loss difficult to quantify "where ... the very viability of the plaintiff's business ... or substantial losses of sales beyond those of the terminated product ... have been threatened." *Tom Doherty,* 60 F.3d at 38. In contrast, courts have found no irreparable harm where "the alleged loss of goodwill was doubtful, and lost profits stemming from the inability to sell the terminated product could be compensated with money damages determined on the basis of past sales of that product and of current and expected future market conditions." *Id.; see, e.g., Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 763 (2d Cir.1979) (where plaintiff in industry for only 1½ years, no irreparable harm found on record void of evidence that defendant's termination of dealership contract would cause plaintiff to lose customers and where defendant agreed to supply products necessary to meet plaintiff's existing commitments); *Vera, Inc. v. Tug "Dakota",* 769 F.Supp. 451, 454–55 (E.D.N.Y.1991) (plaintiff never argued that very existence of business was threatened and damages found to be calculable based on past earnings); *U.S.A. Network v. Jones Intercable, Inc.,* 704 F.Supp. 488, 492–93 (S.D.N.Y. 1989) (harm would not devastate or threaten existence of plaintiff's business and plaintiff's alleged damages were, "if not wholly remote and speculative, vastly exaggerated"); *Marisa Christina, Inc. v. Freis,* 646 F.Supp. 252, 254 (S.D.N.Y.1986) (plaintiff conceded that injuries stemming from termination of licensing agreement could be readily quantified in money damages).

In assessing the parties' arguments concerning irreparable harm the Court is mindful of the short window of time involved here—a little less than four weeks remain before the date on which DOD acknowledges its rights under the Licensing Agreement will in any event terminate. In assessing the issues of damages, goodwill, competitive advantage and the like, the Court must focus on the harm threatened within this time frame and, given DOD's acknowledgment of the termination

notice effective December 14, 2000, and representations that it will in any event comply with its contractual obligation to cease using the Database upon such termination, the Court does not assume that DOD's misuse of the Database would have extended past December 14, 2000.

The Court must also take into account the rapidly-changing world of technology. There is undisputed evidence that DOD and AEC are working on developing a database and library of audio samples of their own and will at some point be able to deliver their own proprietary content through the new DDN system. Nothing in the Licensing Agreement, or in the relief sought by Muze on this motion would prevent DOD from pursuing that business plan in direct competition with Muze. Muze also represents that it is developing improvements to the MSD that will incorporate bar-code scanning similar to that featured in the new DDN system. Thus, it will not be for long that DOD will be lacking rights to deliverable content, or that the MSD will remain behind the DDN technological curve. But there is no evidence that either of these changes would be achievable by December 14, 2000.

Because there is no evidence that DOD would, in the absence of rights to use the Database, be in a position to operate its new DDN system commercially during the period in question, and because MSD is not currently in a position to offer bar-code scanning technology comparable to that of the new DDN, the brief window of time between now and December 14, 2000, is an important one. The harm described above, which began with the September 2000 rollout of the new DDN and would continue in this period in the absence of an injunction, is rooted in the creation of a competitive imbalance that simply could not exist if DOD did not have continued access to the Clips. Continuation of that imbalance through this period would provide DOD with additional goodwill and improper competitive advantages, directly injurious to Muze's very significant commercial relationship with Barnes & Noble and to Muze's public reputation, the impact of which would be difficult, if not impossible, to quantify in money damages.

Muze has met its burden of showing that it will suffer irreparable harm in the absence of preliminary injunctive relief.

*Relief*

In light of the extraordinary nature of irreparable relief and the particular circumstances present here, and because cessation of use of the material will be effective to provide Muze with the protection it seeks, the Court will grant Muze's motion to the extent it seeks to prohibit DOD's use of the Bibliographic Database and Clips. In that DOD has acknowledged its obligation to cease using the Database and to return the material to Muze in connection with the December 14, 2000 date in any event, the preliminary injunction will expire on December 14, 2000. No bond will be required because DOD has agreed in paragraph 6.b. of the DB License that if, as has been found here, its breach of relevant contract provisions "may cause Muze irreparable harm for which there may be no adequate remedy at law, ... Muze shall be entitled to equitable relief by injunction or otherwise, without the obligation of posting any bond or surety." (DB License at ¶ 6.b.).

## CONCLUSION

For the reasons set forth above, the Court finds that plaintiff Muze has met its burden of demonstrating a strong likelihood of success on its cause of action alleging that DOD has breached materially its Licensing Agreement with Muze and that the Licensing Agreement was therefore terminated effective October 24, 2000. The Court further finds that Muze has demonstrated that it will suffer irreparable harm in the absence of an injunction requiring DOD to cease and desist from all utilization of the Database in question, including the Clips. The Court has entered an order granting such preliminary injunc-

tive relief, contemporaneously with the issuance of this Opinion.