**ALCATEL SPACE, S.A., and Alcatel Space Industries, S.A., Plaintiffs,**

v.

**LORAL SPACE & COMMUNICATIONS LTD., Loral Space & Communications Corp., Loral Spacecom Corp., and Space Systems Loral, Inc., Defendants.**

No. 01 Civ. 2265(SAS).

United States District Court, S.D. New York.

April 26, 2001.

George F. Hritz, Hogan & Hartson L.L.P., New York, NY, Robert T. Cave, Jeremy T. Monthy, Hogan & Hartson L.L.P., Washington, DC, for Plaintiffs.

Steven H. Reisberg, Colin F. Bell, Kimberly S. May, Anamika Samanta, Willkie Farr & Gallagher, New York, NY, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

On March 16, 2001, Alcatel Space S.A. and Alcatel Space Industries, S.A. (collec-

tively "Alcatel") filed an action against Loral Space & Communications Ltd. ("Loral"), Loral Space & Communications Corp. ("LSCC"), Loral Spacecom Corp. ("LSC"), and Space Systems Loral, Inc. ("SS/L"), seeking to preliminary enjoin defendants from acting in derogation of two agreements executed by the parties: the April 22, 1991 Operational Agreement (the "Operational Agreement") and the June 23, 1997 Alliance Agreement (the "Alliance Agreement").[1] Plaintiffs also seek, *inter alia*, (1) a declaration that the Agreements remain in full force and effect until lawfully terminated and that defendants must fully perform their contractual obligations under the Agreements; and (2) an order requiring defendants to proceed to arbitration as provided for in the Agreements. On March 29, 2001, defendants cross-moved to dismiss the Complaint and to compel arbitration.

Since suit was filed, plaintiffs have requested arbitration and defendants have consented to arbitrate this dispute. *See* 4/11/01 Transcript of Oral Argument ("4/11/01 Tr.") at 3. The arbitral tribunal will decide whether any party has breached the Agreements and whether they remain in full force and effect. Accordingly, the Court need only address plaintiffs' request to preliminarily enjoin defendants from acting in derogation of the Agreements, pending a decision by the arbitral tribunal.

On March 30, 2001, the parties stipulated to an order preserving the status quo until April 26, 2001.[2] Oral arguments

1. Throughout this Opinion, Loral, LSCC and LSC are referred to collectively as "Loral". The Operational Agreement and the Alliance Agreement are collectively referred to as the "Agreements".

2. Among other things, the order prohibits defendants from: (i) signing, entering into, or announcing any transaction involving SS/L prior to April 26, 2001; and (ii) disclosing any non-public or confidential SS/L information to any third party prior to April 26, 2001.

were held on March 21 and April 11, 2001.[3] For the reasons that follow, plaintiffs' motion for a preliminary injunction is granted.

# I. BACKGROUND

## A. The Parties

Alcatel Space, S.A. is a French *societe anonyme*, and is the sole owner of Alcatel Space Industries, S.A., also a French *societe anonyme*, which ranks among the world's leading space systems manufacturers. *See* Complaint ¶¶ 8, 9. Loral Space & Communications Ltd., a Bermuda company with its principal place of business in New York, New York, manufactures and operates geosynchronous and low-earth orbit satellite systems and develops satellite-based networks for communications and information services.[4] *See id.* ¶ 10. SS/L is a Delaware corporation with its principal place of business in Palo Alto, California, and is an indirect, wholly-owned subsidiary of Loral. *See id.* In the satellite industry, SS/L is a "prime contractor", which is the entity responsible for the design, construction, and delivery of the satellite. *See* 3/29/01 Declaration of C. Patrick Dewitt, Chief Operating Officer of SS/L, in Support of Defendants' Opposition to Plaintiffs' Motion for an Injunction Pending Arbitration and in Support of Cross–Motion to Compel Arbitration ("Dewitt Decl.") ¶ 4; *see generally* Complaint ¶ 14.

## B. The Agreements

On April 22, 1991, Alcatel, Loral Corporation (Loral's predecessor), and other European satellite companies entered into the Operational Agreement.[5] *See id.* ¶ 17. The Operational Agreement provided for the marketing and manufacture of satellite systems through and with SS/L. *See id.; see also* Operational Agreement, Ex. 1 to 3/15/01 Declaration of Gerard Barkats, Alcatel's Member on the Management Liaison Committee, in Support of Plaintiffs' Order to Show Cause ("Barkats Decl."), at 1 (stating that the parties entered into the Operational Agreement out of their "desire to advance the business of SS/L . . ."). At the time the parties agreed to promote SS/L through the Operational Agreement, the Strategic Participants purchased 49% of SS/L's common stock while Loral owned 51% of SS/L's stock. *See* Complaint ¶ 18. At the same time, the parties entered into a Stockholders Agreement giving the Strategic Participants important rights with respect to SS/L. *See id.*

In 1997, at Loral's request, the Strategic Participants exchanged all of their SS/L shares for Loral stock.[6] *See id.* ¶ 20. As a result, SS/L became a wholly-owned subsidiary of Loral. *See* Dewitt Decl. ¶ 6. As

---

3. Upon the parties' request, the Court sealed the transcript of the April 11 oral argument, as well as many of the documents submitted to the Court.

4. Loral is a holding company that is the sole owner of LSCC. *See id.* ¶ 10. LSCC is the sole owner of LSC. *See id.* ¶ 12. Both LSCC and LSC are Delaware corporations with their principal place of business in New York, New York. *See id.* ¶¶ 12, 13.

5. Throughout this Opinion, Alcatel and the European satellite companies are collectively referred to as the "Strategic Participants".

6. The Strategic Participants were paid $374 million in Loral common and preferred stock in exchange for their 49% stock interest in SS/L. *See* 4/4/01 Reply Declaration of C. Patrick DeWitt in Support of Defendants' Opposition to Plaintiffs' Motion for an Injunction Pending Arbitration and In Further Support of Cross–Motion to Compel Arbitration ("DeWitt Reply Decl.") ¶ 3. Loral sought this exchange in order to improve the price of Loral stock by virtue of being an "operating company" rather than a "holding company." 4/3/01 Supplemental Declaration of Gerard Barkats ("Barkats Supp. Decl.") ¶ 6.

the Strategic Participants were no longer stockholders of SS/L, the Stockholders Agreement was terminated and the parties entered into the Alliance Agreement. *See id.*

The Alliance Agreement continued many of the rights and protections established in the Operational Agreement and the 1991 Stockholders Agreement, including the creation of a Management Liaison Committee ("MLC"), on which each Strategic Participant is a member. *See* Alliance Agreement, Ex. 3 to Barkats Decl., § 4.2. The Alliance Agreement also gave the Strategic Participants additional rights, several of which are implicated in this dispute:

(1) *Prior Approval Rights*—section 3.2(b) lists approximately nineteen matters on which SS/L cannot act without first obtaining approval from the SS/L Board of Directors ("SS/L Board"), on which the Strategic Participants sit. Included among these nineteen matters are transactions such as "any merger, consolidation, recapitalization or other reorganization" of SS/L, and "any issuance or sale of SS/L's capital stock." Alliance Agreement §§ 3.2(b)(i) and (b)(xii). In addition, three provisions regulate transactions with a particular third party ("the Prohibited Third Party"). *See id.* §§ 3.2(b)(v), (b)(vi) and (b)(viii). Section 3.2(b)(vi), in particular, prohibits Loral and SS/L from providing to the Prohibited Third Party "any confidential SS/L information" without first seeking approval by the SS/L Board.[7]

(2) *Access to Information Rights*—sections 4.2(e) and 6.4 require Loral to cause SS/L to give the members of the MLC certain information concerning SS/L;

(3) *Rights Upon Share Transfer*—Article V grants the Strategic Participants certain contractual rights in the event that Loral should transfer SS/L shares to a third party.

In 1998, Alcatel purchased the interests of one of the Strategic Participants. *See* Complaint ¶ 24. Because two other Strategic Participants withdrew from the Agreements, Alcatel became the sole remaining Strategic Participant entitled to exercise the rights enumerated in the Alliance Agreement. *See id.*

### C. The Parties' Performance Under, and Alleged Breaches of, the Agreements

Between 1994 and 2000, Barkats regularly received from SS/L, in his capacity as a member of the MLC, material prepared in SS/L's ordinary course of business, including, *inter alia,* SS/L's annual Strategic Plan, financial data and projections, and monthly reporting of SS/L's ongoing satellite programs. *See* Barkats Decl. ¶ 12. SS/L also routinely informed Barkats

---

**7.** Alcatel explains why transactions and communications with the Prohibited Third Party are closely regulated:

> In 1996 Loral Corporation sold its defense electronic and systems integration businesses to [the Prohibited Third Party], and the space-related businesses of Loral Corporation were transferred to Defendant Loral Space & Communications Ltd. In connection with its review of this transaction, under the Hart–Scott–Rodino Antitrust Improvements Act of 1976, the Federal Trade Commission issued a "Decision and Order" (Docket No. C–3685) restricting [the Prohibited Third Party's] ability to have anything more than a passive, 20 percent interest in Defendant Loral Space & Communications[ ] Ltd., which held Loral Corporation space businesses (including SS/L). In light of that restriction, the parties included provisions in the Alliance Agreement specifically limiting Loral's ability to deal with [the Prohibited Third Party] without Strategic Participant consent.

Barkats Decl. ¶ 19.

when it believed materials, documentation, or meetings to which Barkats was otherwise entitled contained information sensitive to potential competition between SS/L and Alcatel. *See id.* ¶ 14. With Barkats' consent, the competitively-sensitive information was removed and Barkats left the room during the pertinent parts of SS/L meetings. *See id.*

Since entering into the Alliance Agreement, Alcatel's satellite business has grown considerably.[8] *See* Dewitt Decl. ¶ 7. Of the approximately 36 commercial geosynchronous communication satellite contract opportunities in the world market last year, Alcatel was the successful bidder for ten of these projects while SS/L was the successful bidder on six. *See id.* ¶ 8. Alcatel and SS/L, however, attempted to minimize their direct competition. For example, SS/L did not submit a bid for any of the ten satellite contracts won by Alcatel, nor did Alcatel submit a bid for five of the six satellite projects won by SS/L prior to October 2000.[9] *See* Barkats Supp. Decl. ¶ 8. Nevertheless, the number of joint projects between Alcatel and SS/L has declined over the past several years. *See* Dewitt Decl. ¶ 9. Currently, the companies are cooperating on only one active satellite program entered into in 1997. *See id.*

In response to these changing conditions, for the past fifteen to eighteen months, Loral has removed an increasing amount of competitively-sensitive material from the packets Barkats received. *See id.* ¶ 10. Since October 2000, SS/L has denied Barkats, over his protest, all access to SS/L information, as well as participation at meetings. *See* Barkats Decl. ¶¶ 15–17; Complaint ¶ 25. Additionally,

the SS/L Board has not met since June 1999, even though section 3.1 of the Alliance Agreement requires two SS/L Board meetings per year. *See* Barkats Decl. ¶ 18; Complaint ¶ 26.

On February 22, 2001, Loral sent a letter to Alcatel alleging that Alcatel had materially breached the Operational Agreement by teaming up with another company, without SS/L's written consent, to pursue a bid for a satellite project for which SS/L was contemplating submitting a bid. *See* Complaint ¶ 28; 2/22/01 Letter from Eric J. Zahler, Loral's President and Chief Operating Officer, to Jean Claude Husson, President and Chief Executive Officer of Alcatel Space Industries ("2/22/01 Termination Letter"), Ex. 5 to Barkats Decl., at 1. The letter then purported to "terminate" the Operational Agreement "effective immediately," and to provide Loral's notice of termination of the Operational Agreement, to take effect twelve months later, pursuant to section 7(v) of the Operational Agreement. 2/22/01 Termination Letter at 1–2; *see also* Complaint ¶ 28.

On February 23 and February 28, 2001, Alcatel responded to Loral's letter and explained that Alcatel had not breached the Agreements, that the Agreements do not provide for immediate termination, and that any dispute involving the Agreements or their breach must be submitted to arbitration. *See* Barkats Decl. ¶ 25; 2/28/01 Letter from Marc Jany, Alcatel's Senior Vice President and General Counsel, to Zahler, Ex. 6 to Barkats Decl. On March 5, 2001, Loral purported to withdraw without prejudice the immediate termination of the Operational Agreement, but maintained

---

8. In July 1998, Alcatel formed Alcatel Space, which transformed Alcatel's satellite operations into a world leader of space systems and into a company "positioning itself as a prime contractor." Dewitt Decl. ¶ 7

9. With regards to the sixth SS/L contract, Alcatel and SS/L submitted joint bids as prime- and sub-contractors. *See* Barkats Supp. Decl. ¶ 8.

that the one-year notice of termination had been effected. *See* Complaint ¶ 30; 3/5/01 Letter from Zahler to Jany ("3/5/01 Zahler Letter"), Ex. 7 to Barkats Decl.

As the alliance has been winding down, Loral has been pursuing "new strategic business opportunities for it and its subsidiaries." 3/29/01 Declaration of Eric J. Zahler in Support of Defendants' Opposition to Plaintiffs' Motion for an Injunction Pending Arbitration and in Support of Cross–Motion to Compel Arbitration ("Zahler Decl.") ¶ 10. Indeed, "[a]t this time, Loral has engaged in discussions with [the Prohibited Third Party] regarding a possible transaction involving SS/L." *Id.* ¶ 13. Loral and the Prohibited Third Party have each signed nondisclosure agreements and "some non-public financial information concerning SS/L has been exchanged, including five-year financial projections." *Id.*

## II. DISCUSSION

"To obtain a preliminary injunction, [plaintiffs] must establish: (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in [plaintiffs'] favor." *TCPIP Holding Co. v. Haar Communications, Inc.*, 244 F.3d 88, 92 (2d Cir.2001) (quotation marks omitted). Because the irreparable harm analysis turns on plaintiffs' rights under the Agreements, I shall

first consider the likelihood that plaintiffs will succeed on the merits of their claims under the Agreements.

### A. Likelihood of Success on the Merits

The Agreements are to be construed in accordance with New York law.[10] *See* Complaint ¶ 7. "Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir.1992); *see also PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir.1996) ("In interpreting a contract, '[w]ords and phrases' are given their plain meaning."); *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1178 (2d Cir.1995) ("In interpreting ... contracts, [courts] must glean the parties' intentions as expressed in the language they used, and not whatever unexpressed views may have existed in their minds."). Where a contract is unambiguous

> [a] court may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case. Further, the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency.

*Cruden*, 957 F.2d at 976 (citations omitted).

---

**10.** The Operational Agreement specifically provides that it is to be construed in accordance with New York law. *See* Operational Agreement, Ex. 1 to Barkats Decl., § 8(f). Moreover, the parties have impliedly consented to the application of New York law by exclusively citing to it in their memoranda of law. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir.2000) ("The parties'

briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law.") (quotation marks and alterations omitted); *American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir.1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry.").

■ Matters extrinsic to an agreement may be considered only where a contract term is ambiguous. *See PaineWebber,* 81 F.3d at 1199. However, "[t]he language of a contract is not made ambiguous simply because the parties urge different interpretations. Nor does ambiguity exist where one party's view strains the contract language beyond its reasonable and ordinary meaning." *Seiden Assocs. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir. 1992) (quotation marks, citation and alteration omitted).[11]

### 1. Prior Approval Rights Guaranteed by Section 3.2

### a. Prohibited Transactions—Sections 3.2(b)(i) and 3.2(b)(xii)

Alcatel seeks to enjoin defendants from engaging in any transaction that violates the provisions of section 3.2 of the Alliance Agreement. Alcatel is primarily concerned that defendants will enter into a preliminary binding agreement or final agreement concerning a matter listed in sections 3.2(b)(i) or 3.2(b)(xii) without presenting the matter to the SS/L Board, as required by section 3.2(a). Those sections, in relevant part, provide:

*Section 3.2 Actions by SS/L Board of Directors.*

(a) [N]either SS/L nor any Subsidiary of SS/L shall take any action regarding the matters set forth in Section 3.2(b) below, unless such matters are duly approved by the SS/L Board of Directors[:]

(b)(1) any issuance or sale of its capital stock or of securities convertible into, exchangeable for or otherwise granting the right to acquire its capital stock (including options, warrants and other

rights) to any person other than Loral or a person who is and remains a Subsidiary of Loral; ...

(b)(xii) any merger, consolidation, recapitalization or other reorganization [of SS/L] with or into any other Person. *Alliance Agreement* §§ 3.2(a), (b)(1) and (b)(xii).

Defendants contend that no preliminary injunction is necessary at this time because by Delaware law, a transaction such as a merger or other reorganization of SS/L must be submitted to the SS/L Board for approval, and therefore, Alcatel's prior approval rights are not in jeopardy. *See* Defendants' Memorandum of Law In Opposition to Plaintiffs' Motion For an Injunction Pending Arbitration and in Support of Cross–Motion to Compel Arbitration ("Def.Mem.") at 9; *see also* 8 Del.Code Ann. tit. 8, §§ 251, 252. Moreover, defendants have agreed to submit to the SS/L Board any agreement to which SS/L is a party—such as a merger, a sale of SS/L's assets, or some other reorganization—thirty days in advance of an agreement's consummation. *See* 4/11/01 Transcript of Oral Arguments ("4/11/01 Tr.") at 27, 61.

Neither Delaware law nor Loral's representation fully protects Alcatel's rights. Defendants' interpretation of Alcatel's rights ignores the plain meaning of the phrase "any action" in section 3.2(a). Unlike the Delaware Code, which requires Board approval for "an agreement of merger or consolidation", 8 Del.Code Ann. tit. 8, § 251, section 3.2(a) requires Board approval for "any action regarding" a matter such as a merger, consolidation, or other prohibited transaction. While the

---

11. The language of a contract is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Seiden Assocs.,* 959 F.2d at 428 (quotation marks omitted).

phrase "any action" implies the existence of several steps in a process, "an agreement" connotes a single final action.[12] Therefore, section 3.2(a) requires Board approval for any of a series of actions leading up to a final agreement, while the Delaware Code only requires Board approval for the final agreement.

■ The difficulty lies, however, in determining the scope of the phrase "any action".[13] Nonetheless, the term must be defined to cover *some* activities. At this preliminary stage, the term "any action" is defined to require Board approval for any meaningful or significant action taken in furtherance of a prohibited transaction. This would include preliminary binding agreements, memoranda of understanding, and announcements by defendants of their intent to enter an agreement concerning a prohibited transaction. However, preliminary non-binding actions, such as negotiations, are not included within the scope of "any action." The parties could not have reasonably intended to require Board approval whenever SS/L's management seeks to assess the interest of potential partners in entering a prohibited transaction. Such a broad interpretation would severely constrain management's flexibility and efficiency.[14] Furthermore, it would be impractical to require Board approval for preliminary negotiations because at that early stage, the contours and details of a potential transaction would not be sufficiently developed so as to permit the SS/L Board to make any intelligent decision. Indeed, Alcatel has conceded that defendants can engage in negotiation. *See* Transcript of 3/21/01 Hearing ("3/21/01 Tr.") at 12. Accordingly, defendants may engage in preliminary negotiations concerning any of the transactions enumerated in section 3.2(b), but may not enter into any preliminary binding agreements regarding matters listed in section 3.2(b)— including the matters enumerated in sections 3.2(b)(i) and 3.2(b)(xii)—without first receiving the approval of the SS/L Board.

### b. Providing Confidential SS/L Information to the Prohibited Third Party

Section 3.2(b) also requires approval of the SS/L Board in the event that SS/L or any of its subsidiaries takes any action concerning:

(b)(vi) any new agreements with [the Prohibited Third Party] ... that involve payment of more than $100,000 in cash or equivalent services; and *the provision by SS/L or Loral to [the Prohibited*

---

**12.** "Action" is defined as "[t]he process of acting or doing", while "any" is defined as "[o]ne or some, regardless of sort, quantity or number." *Webster's II New Riverside University Dictionary* 76, 115 (1994). An "agreement", by contrast, is defined as "[t]he act of agreeing", or in the legal context, "a properly executed and legally binding compact." *Id.* at 87.

**13.** Neither party has addressed the scope of this term, and it is not defined in the Alliance Agreement. Nor has either party submitted any extrinsic evidence which would aid in interpreting this term.

**14.** Section 3.2(b) lists more than nineteen matters on which SS/L cannot act without first obtaining the SS/L Board's approval, including a broad array of business transactions such as: the granting of an exclusive license (section 3.2(b)(iii)); any technology-related agreement with the Prohibited Third Party (section 3.2(b)(v)); any contract with a third party constituting a teaming arrangement to secure certain contracts or promote certain bids (section 3.2(b)(xiii)(A)); any agreement material to the business, operations or financial condition of SS/L out of SS/L's ordinary course of business (section 3.2(b)(xiii)(C)); and any agreement permitting SS/L to provide any technology or intellectual property right to the Prohibited Third Party (section 3.2(b)(xviii)).

*Third Party] of any confidential SS/L information,* provided that no such approval is required for SS/L to renew [certain] agreements ... that were properly authorized and in effect on April 23, 1996, each of which is identified in Schedule 3.2(b)(vi) hereto; . . . .

Alliance Agreement § 3.2(b)(vi) (emphasis added).

Loral admits that it has disclosed confidential information concerning SS/L to the Prohibited Third Party. *See* Zahler Decl. ¶ 13. Nonetheless, it contends that section 3.2(b)(vi) refers only to commercial contracts relating to the purchase of goods or services from the Prohibited Third Party. As a result, Loral argues that the provision of confidential information for the purpose of consummating some other corporate transaction, such as a merger or consolidation requires no approval from the SS/L Board. *See* Def. Mem. at 14–15.

■ Although Loral persuasively argues that section 3.2(b)(vi) concerns only a certain type of commercial contract, this limitation only applies to the phrase in the first sentence of section 3.2(b)(vi) relating to "new agreements with [the Prohibited Third Party]". The plain meaning of *"any* confidential SS/L information" unqualifiedly requires Board approval whenever SS/L or Loral provides confidential or non-public SS/L information to the Prohibited Third Party, regardless of the underlying transaction. Indeed, the use of a semicolon before the confidentiality provision evinces the parties' intent to read this clause untethered by the limited subject matter (certain commercial transactions) of "new agreements". Had the parties intended to limit the scope of the confidentiality provision, they certainly knew how to. No reasonable drafter would have used the broad phrase *"any* confidential SS/L information" had the drafter intended to require Board approval only for lim-

ited types of SS/L confidential information. It is not the Court's responsibility to rewrite a contract term that one party now believes is unwise. *See In re Schenck Tours, Inc.,* 69 B.R. 906, 910–11 (Bkrtcy. E.D.N.Y.1987) ("The community's legitimate need for the stability of business dealings ... finds cogent expression in a strong public policy of upholding the validity of freely negotiated contracts, even unwise ones."). Accordingly, defendants may not disclose any confidential SS/L information to the Prohibited Third Party without first seeking the approval of the SS/L Board.

**2. Access to Information**

Plaintiffs also contend that defendants have breached section 4.2(e) of the Alliance Agreement by withholding certain information from them. Section 4.2(e) provides:

To the extent permitted by [U.S. Government security requirements and export control laws] and subject to all other governmental laws, regulations and contractual restrictions, (a) Loral will cause SS/L to give each member of the Management Liaison Committee access to all pertinent information, records, facilities and personnel of SS/L, including but not limited to, SS/L's regular, monthly management meetings, financial data regarding program and company performance and information regarding the status of SS/L's material activities in pursuing new businesses and developing new ventures, and (b) SS/L will ensure that each such member is fully and regularly informed on a current basis of the ongoing programs and of the elements of the SS/L operations relevant to the implementation of the Strategic Plan. SS/L will use reasonable efforts to obtain waivers or consents consistent with applicable U.S. laws and regulations un-

der any agreements with third parties that restrict the Strategic Participants' access to information otherwise available to them under this Section 4.2(e).

Alliance Agreement § 4.2(e).

Essentially, Alcatel seeks an injunction requiring defendants to provide it with two categories of information: (a) information concerning Loral's business plans regarding SS/L, and (b) information concerning SS/L's ongoing business operations. Before turning to the merits of the proposed injunction, it is first necessary to address the applicable legal standard. Defendants argue that the appropriate standard is that required for a mandatory injunction because plaintiffs are seeking full relief in advance of adjudication on the merits. *See* Def. Mem. at 17 (citing *Brewer v. West Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 743–44 (2d Cir.2000)). In *Brewer*, the Court of Appeals held that a moving party "must make a 'clear' or 'substantial' showing of a likelihood of success in two instances: where (1) the injunction sought is mandatory, i.e., 'will alter, rather than maintain, the status quo'; or (2) the injunction sought 'will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits.' "

■ Defendants are wrong. Alcatel seeks to preserve the status quo. Even though plaintiffs seek to require defendants to take positive acts, those acts are necessary to preserve the status quo—that is, the status quo prior to October 2000. *See Johnson v. Kay*, 860 F.2d 529, 541 (2d

Cir.1988) (injunction which ordered union to expend funds was prohibitory, not mandatory, because the relief was "what [t]he union should have done earlier—open channels of communication to dissenting views"). Moreover, Alcatel is not seeking all the relief sought in the arbitration, such as all the information it has been deprived of since October 2000. Alcatel seeks an injunction requiring defendants to resume providing it the information to which it is entitled. *See* 4/11/01 Tr. at 18. Therefore, plaintiffs need only satisfy the legal standard applicable to a prohibitory injunction.[15]

### a. Information Concerning Loral's Business Plans Regarding SS/L

Plaintiffs contend that "[t]he obligation to provide Alcatel access to information regarding SS/L's 'new businesses and new ventures' in Section 4.2(e)(a) falls on both SS/L and Loral" for two reasons. *First,* subsection (a) begins " 'Loral will cause SS/L to give each member of the [MLC] . . .' thereby binding both parent and its subsidiary at the same time." Pl. Mem. at 7. *Second,* plaintiffs argue that to permit Loral to plan for SS/L's future without disclosing its plans to Alcatel would prevent "Alcatel's meaningful representation on the SS/L Board", and thus violate section 9.2 of the Alliance Agreement which prohibits Loral from taking any action which would adversely affect Alcatel's rights under the Agreements.[16] *Id.* at 8, 11.

---

**15.** Even if the applicable legal standard is that required for a mandatory injunction, plaintiffs have made a substantial showing of a likelihood of success regarding their contention that the Alliance Agreement requires defendants to provide Barkats with information concerning SS/L's ongoing business operations. *See infra* Part II.A.2.b.

**16.** Section 9.2 provides:
Each of SS/L and the Loral Entities shall not, and shall not permit any of their respective Subsidiaries or Affiliates to . . . take any action which is inconsistent with the rights granted to the Strategic Participants in this Agreement, . . . or enter into any other agreement, which would adverse-

■ Plaintiffs' arguments are unavailing. Although section 4.2(e) requires Loral to cause SS/L to provide the MLC members certain information, its plain language limits the information to which MLC members are entitled. Loral must cause SS/L to provide the MLC members information concerning *"SS/L's material activities in pursuing new businesses and developing new ventures,"* Alliance Agreement § 4.2(e)(a) (emphasis added), not Loral's business plans regarding SS/L. Moreover, Alcatel's contention that it needs to know Loral's business plans regarding SS/L to exercise meaningfully its rights as a member of the SS/L Board is a red herring. Alcatel's prior approval rights are no longer in jeopardy because defendants must obtain Board approval before entering any preliminary binding agreement regarding the matters enumerated in section 3.2. Plaintiffs need not be informed of Loral's ideas or negotiations regarding the future of SS/L to exercise their rights as a Board member because those ideas and negotiations may never mature into a preliminary binding agreement.

### b. Information Concerning SS/L's Ongoing Business Operations

■ Defendants argue that Alcatel is no longer entitled to information concerning SS/L's ongoing business operations—such as SS/L's monthly management meetings and financial data regarding program and company performance—because (1) defendants have provided notice of termination of the Agreements; and (2) the parties' relationship has become increasingly competitive. *See* Defendants' Reply Memorandum of Law in Opposition to Plaintiffs' Motion for an Injunction Pending Arbitration and in Further Support of Cross–Motion to Compel Arbitration ("Def. Reply Mem.") at 5. Defendants' first claim is unavailing. Although Loral has "withdraw[n] its notice of immediate termination of the Agreements without prejudice," 3/5/01 Zahler Letter, Ex. 7 to Barkats Decl., it continues to act as though the Agreements have been terminated and Alcatel is no longer a Strategic Participant. But, Alcatel *is* a Strategic Participant and the Agreements remain in full force and effect until the arbitral tribunal decides otherwise.

Defendants cite section 6.4 of the Alliance Agreement in support of their second argument, that Alcatel is no longer entitled to such information because of the increasingly competitive relationship between it and SS/L. That section provides:

*Confidentiality.* Notwithstanding anything to the contrary contained in this Agreement, any written information regarding the bidding or pricing of work and other competitive matters, or any other proprietary information, relating to SS/L or a Strategic Participant will be disclosed hereunder only to those employees of any party hereto having a need to know such information for purposes of performing their duties under and engaging in activities contemplated by this [Alliance] Agreement and the Operational Agreement, including performance of their duties as members of the Management Liaison Committee . . . and such information shall not be used for any other purpose.

Alliance Agreement § 6.4.

■ Section 6.4 is a limiting provision which circumscribes the broad right to information granted by section 4.2(e). How-

---

ly affect the rights of a Strategic Participant under this Agreement or the Operational Agreement.

Alliance Agreement § 9.2.

ever, defendants' contention that Alcatel's MLC member has no need to know the information enumerated in section 6.4 is not supported by the evidence. As described in section 4.2(d), Alcatel's member on the MLC has two principal responsibilities: (1) to advise and assist SS/L's President/Chief Operating Officer in developing and carrying out the Strategic Plan; and (2) to facilitate the working relationships between Alcatel and SS/L on all joint issues. *See* Alliance Agreement § 4.2(d). Alcatel has demonstrated that in the past Barkats has acted in his capacity as an advisor to SS/L's President. *See* 4/11/01 Second Supplemental Declaration of Gerard Barkats ("Barkats Second Supp. Decl.") ¶ 7.[17] Therefore, as a member of the MLC, he has the right to information which would assist him in his role as an advisor. Moreover, there is one active project for which Barkats may act as a facilitator. Accordingly, he has "a need to know" competitive information which in any way concerns or effects the joint project between Alcatel and SS/L.

Finally, defendants allege that "[i]t is also a fact that the people to whom Alcatel intends to supply confidential information about SS/L are the same people who are in charge of competing *against* SS/L" and therefore, there exists the problem of "inevitable disclosure." Def. Mem. at 21–22 (emphasis in original). This "fact" is not

supported by any evidence.[18] Moreover, Alcatel is bound by the confidentiality provisions of section 6.4 and Barkats can only release this competitively-sensitive information to employees who have a "need to know" such information for the purposes of engaging in activities contemplated by the Agreements. Alcatel is required to abide by the terms of the Agreements or face the consequences of a breach.

In short, section 6.4 is only a weak limitation on section 4.2(e). Alcatel has a right, pursuant to section 4.2(e), to information such as SS/L's regular, monthly management meetings, as well as financial data regarding program and company performance. Furthermore, Alcatel has demonstrated that Barkats has a "need to know" and a general right to access written information regarding the bidding or pricing of work and other proprietary information, except for such information that in no way aids Barkats in the performance of his duties.[19]

### 3. Rights Upon a Transfer of Loral's SS/L Stock

Article V of the Alliance Agreement provides Alcatel certain contractual rights in the event that Loral should transfer its SS/L shares to a third party. In the event that Loral sells less than 50% of its ownership in SS/L, Alcatel has the right to re-

---

**17.** Barkats has declared that between 1994 and 1999, he frequently consulted with the then-President of SS/L, Robert Berry, about SS/L strategy and opportunities and would provide SS/L advice and comments regarding SS/L's Strategic Plan. *See* Barkats Second Supp. Decl. ¶ 7. By contrast, Dewitt, SS/L's current Chief Operating Officer, has declared that "Alcatel has never provided general advice to SS/L regarding SS/L's operations, future growth, and development." Dewitt Reply Decl. ¶ 4. However, during the period that Barkats claims he "interfaced" with SS/L's President, Dewitt was Chief Financial Officer, which may explain the discrepancy in the

testimony offered by Barkats and Dewitt. *See* Barkats Second Supp. Decl. ¶ 7.

**18.** Indeed, none of defendants' declarants allege that such inevitable disclosure has occurred.

**19.** This exception, however, does not swallow the rule. Defendants should provide Alcatel the same type and quality of information previously provided pursuant to sections 4.2(e) and 6.4 of the Alliance Agreement, with the same frequency and timeliness as it was provided prior to October 2000.

ceive "as a condition precedent to such Transfer or issuance, an instrument or instruments reasonably satisfactory to [Alcatel], confirming that the Transferee or subscriber agrees to assume the obligations of [Loral] under this Agreement." Alliance Agreement § 5.2(c). Moreover, Loral must give Alcatel "written notice describing the Third Party Transfer *promptly after* agreeing to the Third Party Transfer and in any event no later than ten days before such Third Party Transfer is consummated." *Id.* § 5.2(b) (emphasis added).

In the event that Loral decides to sell 50% or more of its SS/L stock, it is required to provide Alcatel with notice of the price, terms and conditions of the sale. *See id.* § 5.3(b). Alcatel then has thirty days to decide whether to exercise the option to purchase the SS/L stock on the same terms and conditions. *See id.* § 5.3(e). Alternatively, Alcatel can elect to exchange its Loral shares for up to 49% of SS/L and continue the alliance arrangement with the new owners, who will be required to reinstitute the terms of the 1991 Stockholders Agreement. *See id.* § 5.4.

■ Loral does not dispute that it is bound by the obligations of Article V and agrees to honor Alcatel's rights in the event Loral sells its SS/L shares to a third party.[20] *See* 4/11/01 Tr. at 51, 54. However, Alcatel asserts that in the event Loral decides to sell its SS/L shares to the Prohibited Third Party, then Alcatel's prior

approval rights are triggered under section 3.2(b)(vi), which applies to "any new agreements with [the Prohibited Third Party] ... that involve payment of more than $100,000 in cash or equivalent services." Alcatel's argument is not persuasive. None of the thirty-two paragraphs in Article V place any restrictions on a transfer by Loral of its SS/L shares to the Prohibited Third Party.[21] The reason Article V exists is precisely because a sale by Loral of its SS/L stock is not included in section 3.2. Moreover, the "new agreements" to which section 3.2(b)(vi) refers are commercial contracts relating to the purchase of goods or services from the Prohibited Third Party. *See supra* Part II.B.1.a. A transfer to the Prohibited Third Party of Loral's SS/L stock would not constitute a "new agreement" unless it was part of a larger transaction that included a purchase of goods or services.[22]

In conclusion, Alcatel has demonstrated a likelihood of success on its claim that: (1) pursuant to section 3.2 of the Alliance Agreement (a) defendants must receive Board approval prior to entering into any preliminary or final agreement regarding any of the matters listed in section 3.2(b), and (b) defendants may not provide the Prohibited Third Party any non-public or confidential SS/L information without first seeking Board approval; (2) Barkats has a right to receive information concerning SS/L's ongoing business operations, pursuant to sections 4.2(e) and 6.4; and (3) Loral may not consummate any sale, transfer or

---

**20.** At oral argument, Loral conceded that Article V may not be used as a subterfuge to avoid Alcatel's rights. *See* 4/11/01 Tr. at 29. This conclusion is compelled by section 9.2, which explicitly prohibits Loral from "enter[ing] into any agreement with respect to its securities ... which would adversely affect the rights of [Alcatel] under this [Alliance] Agreement or the Operational Agreement." Alliance Agreement § 9.2.

**21.** Indeed, the Prohibited Third Party is never named in Article V.

**22.** However, in the event that Loral pursues a transfer of its SS/L stock to the Prohibited Third Party, Loral is still bound by the confidentiality provision of section 3.2(b)(vi).

other disposition of its ownership of SS/L stock without respecting Alcatel's rights under Article V.

## B. Irreparable Harm

■ "Irreparable harm 'means injury for which a monetary award cannot be adequate compensation.'" *Jayaraj v. Scappini,* 66 F.3d 36, 39 (2d Cir.1995) (citing *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979)). The harm must be imminent or certain, not merely speculative. *See Tom Doherty Assoc. v. Saban Entm't, Inc.,* 60 F.3d 27, 37 (2d Cir.1995).

■ Alcatel has adequately demonstrated that breaches of the Alliance Agreement will cause Alcatel irreparable harm. *First,* Alcatel has demonstrated that a public announcement of an agreement, such as a restructuring of SS/L, "would have immediate, negative effects on Alcatel's business [including] ... Alcatel's chances of obtaining additional contracts on a number of pending satellite opportunities, including Intelsat IX, M2A, and other potential program contracts." Barkats Decl. ¶ 30. Such a harm is not readily quantifiable. Although the loss of these contracts may not destroy Alcatel's business, the limited number of satellite opportunities available warrants a finding of irreparable harm. *See Tom Doherty,* 60 F.3d at 38 (finding irreparable harm where licensor's breach of contract deprived plaintiff of "a wholly unique opportunity" which would deprive the plaintiff of prospective business and goodwill); *Interphoto Corp. v. Minolta Corp.,* 417 F.2d 621, 622 (2d Cir.1969) (per curiam) (affirming finding of irreparable harm because plaintiff "would be unable to calculate its damages since it would suffer not merely loss of profits with respect to [defendant's] goods but loss of good will from the lack of a 'full line.'").

■ *Second,* the loss of Alcatel's bargained-for minority rights independently satisfy the irreparable harm requirement. Alcatel negotiated for particular contractual rights—such as the right to receive information concerning SS/L, the right to have certain preliminary binding agreements involving SS/L presented to the SS/L Board, and the right to require SS/L Board approval prior to defendants' disclosing confidential SS/L information to the Prohibited Third Party—which, if breached, would constitute irreparable harm. *See, e.g., Lichtenberg v. Besicorp Group, Inc.,* 43 F.Supp.2d 376, 390 (S.D.N.Y.1999) (stating that depriving shareholders of the opportunity to make a fully informed decision with respect to a merger by providing them with a materially misleading proxy constitutes irreparable harm), *appeal dismissed,* 204 F.3d 397 (2nd Cir.2000); *Davis v. Rondina,* 741 F.Supp. 1115, 1125 (S.D.N.Y.1990) (breach of shareholders agreement by excluding minority shareholder from management of the corporation constitutes irreparable harm); *cf. Vanderminden v. Vanderminden,* 226 A.D.2d 1037, 641 N.Y.S.2d 732, 737 (3rd Dep't 1996) (finding irreparable harm where violation of voting trust agreement would shift the balance of power in a closely-held family corporation); *Brenner v. Hart Sys., Inc.,* 114 A.D.2d 363, 493 N.Y.S.2d 881, 884 (2d Dep't 1985) (holding that denying corporate director his right to examine corporation's books and records constitutes irreparable harm). Moreover, plaintiffs need not wait until a transaction is nearly consummated prior to seeking injunctive relief, as defendants argue. *See* Def. Mem. at 7. Defendants' actions in negotiating with, and disclosing confidential SS/L information to, the Prohibited Third Party, and refusing to provide Alcatel's member on the MLC the information to which he is contractually entitled dem-

onstrate that irreparable harm *is* imminent and real. Moreover, although defendants represent that a final agreement is not imminent, *see* Def. Mem. at 30, a preliminary binding agreement may be. Accordingly, plaintiffs have adequately demonstrated irreparable harm.

## III. CONCLUSION

For the reasons stated above, plaintiffs' motion for a preliminary injunction is GRANTED. Defendants' cross-motion to dismiss the Complaint is DENIED. Defendants' cross-motion to compel arbitration is GRANTED on consent. The Court retains jurisdiction over this action to hear any emergency requests the parties may have until such time as the arbitral tribunal is appointed.

It is further ORDERED that until further Order of this Court or of the arbitral tribunal, or upon the expiration of the Alliance Agreement, whichever is earlier:

1. Defendants shall provide plaintiffs with thirty (30) days notice (1) in advance of any meeting of the Board of Directors of SS/L to consider approval of any SS/L Transaction, or (2) before consummation of any Stock Transaction.[23]

2. Defendants shall include in any agreement concerning an SS/L Transaction or Stock Transaction the express condition that any such agreement is made subject to plaintiffs' rights under the Alliance Agreement.

3. Defendants shall not provide any non-public or confidential SS/L information to the entity named in section 3.2(b)(vi) of the Alliance Agreement without approval of the SS/L Board of Directors.

4. Prior to any SS/L Transaction, defendants shall cause a meeting of the SS/L Board of Directors to be duly convened and conducted for the purpose of considering such Transaction.

5. On or before May 14, 2001, defendants shall resume providing to plaintiffs the same type and quality of information previously provided pursuant to sections 4.2(e) and 6.4 of the Alliance Agreement, with the same frequency and timeliness as it was provided prior to October 2000.

6. Plaintiffs fully reserve their rights to seek immediate, preliminary, and/or permanent relief, including without limitation their rights to seek information covered by Articles IV and VI of the Alliance Agreement withheld by defendants since October 2000 and copies of non-public or confidential SS/L information that has been provided to Third Parties. Any forbearance by plaintiffs from seeking such relief shall not constitute a waiver, an admission of lack of immediate or irreparable harm, or any other affirmative defense and/or defense on the merits.

7. Capitalized terms used in this Order shall have the following meanings:
   a. "Third Party" means a person or entity not party to the Alliance Agreement and Operational Agreement among the plaintiffs and defendants; and
   b. "SS/L Transaction" means any consolidation and/or restructuring of SS/L, or other agreements that have the same practical effects as a consolidation or restructuring, including any memorandum of understanding, preliminary agreement, announcement, or binding commitment to enter into any such consolidation or

---

**23.** Although Article V of the Alliance Agreement only requires a minimum of ten days notice in the event that Loral transfers less than 50% of its SS/L stock to a third party, defendants have consented to providing thirty days notice. *See* 4/11/01 Tr. at 50–51.

restructuring with any Third Party, and shall include, without limitation, the following: (i) those events covered by sections 3.2(b)(i) and 3.2(b)(xii) of the Alliance Agreement; or (ii) any agreement between the Loral Defendants and a Third Party in which the Loral Defendants commit to use their control over SS/L to achieve the practical effects of a transaction described in clause 7(b)(i) *supra*.

c.  "Stock Transaction" means any sale, transfer or other disposition of ownership or control of the stock of SS/L owned by Loral.