TVT RECORDS and TVT MUSIC, INC., Plaintiffs,

v.

THE ISLAND DEF JAM MUSIC GROUP and Lyor Cohen, Defendants.

No. 02 CIV.6644 VM.

United States District Court, S.D. New York.

Oct. 2, 2002.

James E. d'Auguste, James Philip Chou, Akin, Gump, Strauss, Hauer & Feld, L.L.P., New York City, Peter L. Haviland, Los Angeles, CA, for Plaintiffs.

Michael T. Mervis, Proskauer, Rose, L.L.P., New York City, Mary Mulligan, Universal Music Group, New York City, Robert J. Eddington, Proskauer Rose LLP, New York City, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiffs TVT Records and TVT Music, Inc. ("TVT") filed a motion for a prelimi-nary injunction on August 28, 2002 seeking to bar defendants The Island Def Jam Music Group ("IDJ") and its principal, Lyor Cohen ("Cohen"), from frustrating the scheduled release of one of TVT's al-bums (the "CMC Album"); from conduct that would interfere with the contract be-tween TVT and the artists supplying the content of the CMC Album; and from continuing to utilize some of TVT's copy-righted material on an IDJ video disc enti-tled, "Irv Gotti Presents: The Inc." An evidentiary hearing was held before the Court on September 23–24, 2002. For the reasons stated in the Court's statement on the record at the proceeding on September 30, 2002, a copy of which is attached and incorporated hereto, it is hereby

**ORDERED** that the portion of TVT's motion for a preliminary injunction seek-ing to bar IDJ and Cohen from interfering with the scheduled public release of the CMC Album in November 2002 is denied; and it is further

**ORDERED** that, pending final resolu-tion of this dispute at trial, IDJ be en-joined from releasing a recording entitled "The Last Temptation", featuring the art-ist known as Ja Rule, in any form incorpo-rating any of the CMC recordings, both old and new, at issue in this action; and it is further

**ORDERED** that, pending the final reso-lution of this dispute at trial, IDJ be fur-ther enjoined from interfering with TVT's efforts to obtain possession of the contents of the CMC Album from the artists, agents or third parties, as well as from improper-ly acquiring and releasing the recordings identified as the contents of the CMC Al-bum, provided that TVT itself shall not release the CMC Album pending the de-termination of its rights thereto at the trial of this matter; and it is hereby finally

**ORDERED** that, on IDJ's representa-tions that upon TVT's request, it will cease

production and distribution of certain CMC material owned by TVT in a video recording entitled, "Irv Gotti Presents: The Inc.," the portion of TVT's motion seeking to enjoin IDJ from continuing to use such material is denied.

**SO ORDERED.**

**Statement by the Court Regarding Plaintiffs' Motion For A Preliminary Injunction September 30, 2002**

**I.**

This dispute began with a proposed collaboration to produce a music album—referred to as the "CMC Album"—between plaintiffs TVT Records and TVT Music, Inc. ("TVT") and two artists, Jeffrey Atkins, p/k/a Ja Rule ("Ja Rule"), and Irv Gotti("Gotti"), who were under exclusive contract with defendant The Island Def Jam Music Group ("IDJ"). TVT seeks to enjoin IDJ and its principal, Lyor Cohen ("Cohen"), from (1) any conduct frustrating TVT's release of the CMC Album with Gotti and Ja Rule by November 5, 2002; and (2) interfering with TVT's contractual relationships with these artists who are obligated to complete and deliver the CMC Album to the TVT pursuant to a contract dated July 2, 2001.

■ The governing law in this matter is clear. In order to prevail on a motion for a preliminary injunction, a party must establish irreparable harm and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in its favor. *See Kamerling v. Massanari*, 295 F.3d 206, 214 (2nd Cir. 2002).

**II.**

Turning to the facts of the present dispute, the Court begins with TVT's breach of contract and fraud claims. On the issue of whether a licensing contract between TVT and IDJ was formed, as a side agreement (the "Side Agreement") to the CMC Album collaboration, under which IDJ consented to the collaboration between TVT and Gotti and Ja Rule, evidence has been presented as to a variety of written and oral communications, to which the parties ascribe differing interpretations.

In reviewing the likelihood of success on the merits prong of the preliminary injunction standard, the Court notes the following items in evidence, among others:

1. Various conversations occurred in mid-to-late 2001 between William Leibowitz ("Leibowitz") on TVT's part and Jeffrey Kempler ("Kempler") and Jonathan Lieberman ("Lieberman") on IDJ's part, during which the terms of the Side Agreement in dispute were addressed and negotiated, and in which the parties disputed whether the representatives of IDJ expressly agreed to the Side Agreement.

2. Conversations between Leibowitz and Steve Shapiro ("Shapiro"), the artists' lawyer, in which the latter expressed concern over potential liability on the part of Ja Rule and Gotti both to TVT under the so-called "Heads of Agreement" obligations to produce the CMC Album and to IDJ under their respective exclusive employment contracts, in the absence of IDJ's assent to the CMC Album collaboration.

3. Kempler's notes taken during a telephone conversation with Shapiro in which the profit sharing terms of the alleged Side Agreement were discussed and where it appears Shapiro told Kempler that Cohen knew and consented to the Side Agreement and that Gotti and Ja Rule wanted to make the CMC Album so as not to hold back the careers of the other two members of CMC.

4. A September 25, 2001 letter from Lieberman to Leibowitz in which Lieberman's handwritten edits to a Side Agreement draft were enclosed. The Court notes that Lieberman asked for execution copies from Leibowitz in this letter (the "Side Letter") and, in particular, that IDJ's principals were copied on this mailing.

5. A letter dated August 1, 2001 arranging for part of Gotti's payment, pursuant to the CMC Album contract with TVT, to be paid to IDJ. The Court notes that the evidence indicates that this redirection of payment was actually arranged by IDJ or with its participation.

6. A November 15, 2001 letter from Leibowitz to Kempler and Lieberman stating that Leibowitz had received assurances from Lieberman that IDJ consented to the CMC Album collaboration but had not yet received written execution copies to that effect. In particular, the Court notes that IDJ made no effort to correct TVT's apparent and stated reliance on these mentioned assurances.

IDJ's position is that all these communications were just part of the negotiations in the event it ultimately would decide to enter into the Side Agreement and grant TVT, Ja Rule, and Gotti permission to produce the CMC Album. TVT's claim is that the communications indicate that IDJ in fact had agreed to give consent and thus constitute a consummated contract or evidence of a binding oral agreement.

In resolving these differing interpretations, the Court notes that IDJ admits that it was placed in a difficult situation by TVT's offer to market a CMC Album with Gotti and Ja Rule. The difficulty arose in that Gotti's contract with IDJ was set to expire in February of 2002 and IDJ wanted to renew its contract with him. Therefore, IDJ did not want to risk upsetting Gotti or Ja Rule by refusing to consent to their project with TVT. At the same time, however, IDJ did not want to grant a competing label access to these two popular and lucrative artists.

Here, the record points to evidence that Ja Rule and Gotti desired to help further the careers of the other two CMC members. On this point, the Court notes little, if any, compelling evidence of "threats" by TVT to embarrass Ja Rule with old song releases reflecting an outdated image, nor is the Court persuaded that Gotti and Ja Rule went along with TVT only reluctantly, as IDJ claims. In particular, the Court notes that in an email to Shapiro sent on August 3, 2001 at 3:49 PM, Lieberman stated that he was "pushing very hard to get Lyor and Kempler to focus on closing the TVT deal quickly because that is what Irv wants". It seems inconsistent to characterize Gotti's attitude regarding the CMC project as "reluctant," or TVT's inducements as "threats," when one of IDJ's own senior attorneys negotiating the Side Agreement understood that Gotti wanted the CMC Album project to proceed "quickly."

TVT asserts that an oral agreement was reached between it and IDJ. On this issue, the Court notes that Lieberman initialed the Side Letter for Kempler's signature and that Kempler himself executed a copy, one that was never delivered to TVT in the end. This initialing and signing indicates that IDJ, at least through Lieberman, and perhaps, Kempler, understood that an agreement had been reached, at least for a time. Furthermore, Defendants' Exhibit 52, an internal IDJ approval memorandum regarding an amendment to its recording contract with Ja Rule, states at ¶ B(4), regarding TVT's anticipated release of the CMC Album, that IDJ "would strongly

prefer that TVT not do so." This statement begs the obvious question: If as, IDJ maintains, it never consented to the CMC Album collaboration, such consent being necessary to that project given Gotti and Ja Rule's exclusive employment contracts with IDJ, why would IDJ be in a position to "strongly prefer that TVT not do so"? This statement, then, could be construed as persuasive evidence that as late as mid-August 2002, IDJ may have understood and accepted, though perhaps begrudgingly, that TVT had authority to proceed with the CMC recording.

■ The Court concludes that on balance this evidence supports a conclusion of a likelihood that TVT will succeed in establishing one or more of its contract claims. At a minimum, the Court recognizes that IDJ admits that it went along with what it terms "negotiations" in a manner that would not dissatisfy Gotti and Ja Rule given their interest in making the CMC Album. IDJ admits, in other words, that it did not expressly withhold its consent to the CMC Album project in light of its desire to renew Gotti's contract, which would expire in February 2002. But in conducting themselves in a manner that would have suggested to Gotti and Ja Rule acquiescence to the TVT venture, it is reasonable to conclude that, in the process, that same impression was conveyed to and formed by TVT, and, further, that TVT's reliance thereon could have been reasonable.

On a related point, the Court notes that IDJ characterizes TVT's negotiations with its two exclusive artists as improper meddling in its business affairs. The Court is not persuaded that it is reasonable to characterize these actions by TVT, which was offering its services as a competitor in the marketplace, as "meddling," despite IDJ's exclusivity contracts with Ja Rule and Gotti, because the evidence indicates that TVT recognized from the start that IDJ's permission would be needed for the project to proceed, secured either by them or the artists.

The Court turns to the second prerequisite for preliminary injunctive relief: irreparable harm. In this regard, despite the meritorious aspects of TVT's presentation, the Court is not persuaded that TVT has established adequate irreparable harm to merit a preliminary injunction that would, in essence, enforce the purported Side Agreement between TVT and IDJ to the CMC Album project. The Court so finds because the evidence indicates that any harm from a delay in the release date of this album pending resolution at trial would not be irreparable. The Court notes the following items in evidence, among others, supporting this conclusion:

1. TVT has advertized various release dates for its CMC Album: "early 2002," "late 2002," November 26, 2002, and November 5, 2002. These changes suggest that one more adjustment to the release date would not be as harmful as TVT fears.

2. Bryan Leach ("Leach"), TVT's own employee, testified that release dates are missed "often," which leads the Court to the same conclusion.

3. TVT recently missed an advertised release date for an album by another of its artists, Naughty By Nature, and Leach characterized that release as successful nonetheless. Leach also testified that TVT received no complaints from Naughty By Nature or from retailers as a result of its having missed the target date.

For these reasons, despite TVT's persuasive presentation regarding its prospects for success on the merits, TVT has not convinced the Court that the harm it would suffer from having to adjust its CMC Album release date to accommodate

a trial is irreparable. For these reasons the Court will order that the portion of TVT's motion for a preliminary injunction seeking to bar IDJ and Cohen from interfering with the scheduled delivery of the anticipated content of the CMC Album is denied.

### III.

Turning to TVT's allegations of tortious interference with a contract, TVT asks this Court to enjoin IDJ from releasing its "The Last Temptation" solo Ja Rule album pending resolution of the instant dispute at trial. In considering this portion of TVT's motion, the Court notes, in particular, the following:

1.  The evidence indicates that IDJ was interested in acquiring the original CMC songs recorded in and around 1994 and that it recruited Gotti in this endeavor. Defendants' Exhibit 52—the internal IDJ approval memo for the 2002 amendment to Ja Rule's recording contract—states as much at ¶ B(4). Plaintiffs' Exhibit 64—the actual August 16, 2002 amendment to Ja Rule's recording contract—reiterates at § 5(a) IDJ's interest in past CMC recordings.

2.  Indeed, Plaintiff's Exhibit 64 references, at § 5(a), not only these 1994 CMC tracks but also those recorded pursuant to the 2001 collaboration agreement between TVT and Ja Rule and Gotti: *"At various times [Irv Gotti] recorded and delivered to TVT records master recordings embodying the performances of [Ja Rule] . . . ."* (emphasis added). And, Kempler testified that delivery of these 2001–2002 CMC recordings, free of copyright interest by TVT, would satisfy part of Ja Rule's contractual obligations to IDJ.

3.  There also has been testimony, in particular by Cohen and Gottlieb, that IDJ's release date for Ja Rule's

"The Last Temptation" album was moved from early 2003 to November of 2002, which would place it in direct competition with the CMC Album's planned release.

4.  And, the IDJ approval memo for the 2002 amendment to its recording contract with Ja Rule indicates, at ¶ B(5), that Cohen and IDJ intended to "aggressively" re-release Ja Rule's previous three hit albums also in the fourth quarter of 2002.

To the Court, the significance of this and related evidence is as follows:

If IDJ were to succeed in improperly acquiring the original CMC recordings, that would prevent TVT from *ever* releasing the CMC Album because this album is intended as a compilation of old and new CMC songs. The same result would follow if IDJ improperly acquired the songs recorded pursuant to the 2001 agreement between TVT and Gotti and Ja Rule. The aggressive marketing of the next Ja Rule release and of his past three hit albums concurrently with the anticipated release of the CMC Album by TVT could have the effect of so stifling TVT's CMC Album prospects as to deter TVT from releasing its album at that time or, indeed, *ever,* given the market saturation by the actions of IDJ.

It is undisputed that "The Last Temptation" is being distributed by IDJ pursuant to a contract the validity of which is not at issue in the present dispute. It is also clear that scheduling the release and availability of products in the marketplace is a legitimate aspect of free enterprise competition. But the issue here is tortious interference with a contract. The Court finds that the evidence, particularly that recounted above, presents a "serious question of fact" as to whether IDJ engaged in these activities not merely to overshadow and defeat TVT's album release in the

marketplace, but also for the *ultimate* purpose of acquiring the new CMC songs recorded in 2001–2002, and releasing them under its own label either separately or as a component of "The Last Temptation," thereby frustrating TVT's ability ever to issue its new CMC release.

This risk—that IDJ would effectively bar TVT from ever release its CMC Album—presents a harm that has the sort of permanence that is appropriately considered irreparable. *See Otis Elevator Co. v. Local 1, Intn'l Union of Elev. Const.*, 684 F.Supp. 80, 83 (2nd Cir.1988) (prospect of permanent loss of business due to work stoppages constitutes irreparable harm).

This harm would also be difficult to quantify. If IDJ were to improperly acquire and preemptively release part or all of the anticipated content of the CMC Album, the recording's combination of songs could differ from the overall composition of the CMC Album TVT envisioned given TVT's ownership of the 1994 CMC songs intended to compose part of the CMC Album and given that "The Last Temptation" is contemplated as a solo Ja Rule album. This difference in composition would result in differing degrees of appeal to purchasers, meaning that a direct transfer of profits from any infringing album release by IDJ to TVT—assuming that such infringement actually occurs and that TVT could prove it at trial—would not be available as a measure of damages, leaving the Court to speculate as to album sales and profit figures.

Alternatively, if IDJ were to improperly acquire part or all of the anticipated content of the CMC Album, including the original CMC songs which IDJ claims are outdated and embarrassing to Ja Rule, and then locked them away forever, then, assuming again TVT were to prevail at trial, delineating damages relating to lost sales of these songs would be just as or even more speculative.

The Court finds these considerations relevant because both the Second Circuit and this District have held that losses that are difficult to quantify constitute irreparable harm. *See Gerard et al. v. Almouli, et al.*, 746 F.2d 936, 939 (2nd Cir.1984) ("The likelihood of irreparable harm was demonstrated since appellees' damages may not be quantified."); *Alcatel Space, S.A. v. Loral Space & Communications Ltd.*, 154 F.Supp.2d 570, 584 (S.D.N.Y.2001); *Muze, Inc. v. Digital On–Demand, Inc.*, 123 F.Supp.2d 118, 132 (S.D.N.Y.2000).

Additionally, TVT's never releasing the CMC Album would have collateral consequences to its business in light of the nature of the music industry and TVT's place in it. The evidence, and in particular the Court credits the testimony of Leach and Gottlieb, indicates that as a record label, TVT's success is dependent on its relationships with an array of content suppliers—the artists, producers, editors, studios, etc.—and retailers—vendors, radio stations, MTV, etc. These relationships are affected by TVT's continuing ability to supply albums for distribution. And, as an independent label, TVT's business, while certainly not a pittance, is smaller than that of the major labels. Accordingly, it is reasonable to conclude that TVT carries less clout in the industry and that its presence can withstand less interruption.

The Second Circuit and this District have recognized that harm is irreparable when "substantial losses of sales beyond those of the terminated product ... have been threatened." *Tom Doherty Assocs. Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 38 (2nd Cir.1995) (citations omitted). And, this Court recently made it clear in *Alcatel Space*, 154 F.Supp.2d at 584, that an alleged lost opportunity need not destroy the plaintiff's business when similar opportunities are limited in their availability. *Id.* ("Although the loss of these con-

tracts may not destroy Alcatel's business, the limited number of satellite opportunities available warrants a finding of irreparable harm.").

Beyond losses, the Second Circuit regards damage to business relationships significant. In *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907–909 (2nd Cir.1990), the Circuit Court found irreparable harm where a news wire service's ability to continually provide news photographs was disrupted, on the theory that "terminating the delivery of a unique product to a distributor whose customers expect and rely on the distributor for a continuous supply of that product almost inevitably creates irreparable damage to the good will of the distributor." *See also AIM Intn'l Trading, LLC. v. Valcucine S.p.A.*, No. 02–CV–1363, 2002 WL 1285557 (S.D.N.Y. June 11, 2002) ("If the plaintiffs' application for a preliminary injunction is not granted, [its] network of relationships may be destroyed, and plaintiffs themselves will have no products to sell.").

■ Ja Rule is a multi-platinum recording artist, and, as IDJ admits, his sort of success is very rare. It follows that releasing an album featuring an artist with multi-platinum success is a rare opportunity. Furthermore, because Ja Rule is featured on the CMC Album, the Court concludes that this album is very unique. The Court also finds considerable risk that TVT's business relationships, specifically, its ability to attract future artists and maintain the trust of retailers, will be irreparably harmed if TVT is improperly prevented from ever bringing this unique product to market. For these reasons, as well as the permanence of this risk, together with the fact that quantifying its value in monetary terms would be highly speculative, a finding of irreparable harm on this point is warranted.

Finally, the Court finds that the balance of hardships tips decidedly in TVT's favor.

TVT assumed the risk of marketing the CMC Album, planning and coordinating this project over the last 15 months and investing significant resources totaling, by TVT's estimates, over one million dollars. This risk and investment would never be recovered if IDJ improperly acquires the content of the CMC Album, which would represent a windfall at TVT's expense, as IDJ invested and risked nothing in this album's preparation. By granting TVT's request to restrain IDJ pending trial from releasing "The Last Temptation," but only to the extent that that album may be used as a vehicle for IDJ to improperly obtain and release TVT's CMC recordings, the only hardship IDJ may suffer is that associated with rescheduling, once again, its release date for an album. For the reasons already stated when the Court addressed TVT's assertions of harm at having to delay its own release of the CMC Album, a reasonable delay in an album's release date is not "irreparable" in the Court's view, nor does it compare to the risk potentially facing TVT that IDJ will manage to improperly acquire or use the content of the CMC Album, thereby preempting or preventing the CMC Album's release altogether.

Because the Court finds the timing and potential content of "The Last Temptation" album release to be the single greatest threat to the CMC Album's release, and in an effort to tailor effective relief as narrowly as possible, the Court restricts its remedial focus to this album. Accordingly, for the reasons stated, the Court will order that pending final resolution of this dispute at trial, IDJ be enjoined from releasing the so-called "The Last Temptation" Ja Rule album in any form incorporating any of the CMC songs, both old and new, at issue in this dispute. The Court points out that the combined effect of the two rulings announced thus far—the former denying TVT's request to enjoin IDJ

from interfering with the scheduled release of the CMC Album, and the latter enjoining IDJ from releasing "The Last Temptation" album in a form that will interfere with TVT's rights in the CMC songs in question—is that neither side may release a noncomplying album pending ultimate resolution of this case, either through trial or otherwise.

## IV.

Finally, TVT also seeks to enjoin IDJ from continuing to use certain CMC material owned by TVT in a DVD video entitled "Irv Gotti Presents: The Inc." on the grounds that IDJ's license from TVT to use these materials was fraudulently and deceptively obtained. Because IDJ has offered to cease production and distribution of this video in the course of these proceedings, the Court will order that this portion of TVT's motion be denied.